THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WALTER CANITY, Defendant-Appellant.

Second District    No. 80-274

Opinion filed September 15, 1981.—Rehearing denied October 19, 1981.

Stephen E. Walter, of Walter and Smoker, of Waukegan, for appellant.

Fred Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Gene Armentrout, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE REINHARD delivered the opinion of the court:

Defendant, Walter Canity, was charged in an amended information with the offenses of deviate sexual assault (Ill. Rev. Stat. 1979, ch. 38, par.

11—3(a)) and burglary (Ill. Rev. Stat. 1979, ch. 38, par. 19—1(a)) arising out of an incident which occurred on July 24, 1979. Defendant filed pretrial motions to quash the arrest, suppress statements, and suppress identification testimony, all of which were denied by the trial court. Following a jury trial, defendant was found guilty of both charges; subsequently, the court vacated the judgment entered on the burglary charge. Defendant was sentenced to serve 6 years with the Department of Corrections on the deviate sexual assault conviction. Defendant now appeals, contending that: (1) the court erred in denying his motion to suppress identification testimony since it failed to determine the reliability of each witness' identification on an individual basis; (2) the court should have suppressed all the identification testimony based upon an unnecessarily suggestive show-up; (3) the court should have quashed the arrest and suppressed the subsequent identification; (4) the court erred in admitting certain evidence; and (5) the evidence was insufficient to prove the offenses beyond a reasonable doubt.

At the hearing on the pretrial motions, defendant testified as follows. On August 14, 1979, defendant was employed as a U.S. Army recruiter, and lived with his wife in a Waukegan apartment. On that date, between approximately 11 and 12 p.m., he had occasion to be at the Smith Avenue Apartments in Knollwood, Lake Bluff, Illinois. He stated that he was driving an army automobile which had large army insignias on both doors and was wearing an army uniform, including ribbons and a name badge. He testified that he drove through the apartment complex and then parked his vehicle on a cul-de-sac at the entrance to the complex. He exited his vehicle and began walking around the apartment complex looking for the building in which he believed a friend of his lived. At trial, he testified that the individual was called Dewey. After walking by a number of different buildings, he realized that he was unable to determine if his friend lived in that complex or not, so he began to make his way back to his car. He then realized that there was another apartment complex adjacent to the Smith Avenue Apartments and decided to "check those out to see whether he was living there or not." He went over to those buildings but, again realizing that he would be unable to locate his friend's apartment, walked back across a field to his car.

As he began to unlock his car, he heard someone yell, "Hold it, Sarge." Two individuals who identified themselves as deputy sheriffs approached defendant and asked him for some identification. Defendant then produced his military I.D. card and was ordered to get up against his car. After being searched, two other officers arrived, one of whom asked for defendant's car keys. The inside of his car and the trunk were then searched. One officer said to another, "Hold him here while I go get the witnesses."

Two men were then brought over to view defendant. Flashlights were shined in his face and he was told to turn in various positions. After the two men were taken away, the officers brought out two women who also viewed defendant in various poses as flashlights were shined in his face. The women were then taken away, but one of them returned a while later and again viewed defendant while lights were shined in his face. After she left, defendant was ordered to get in the back seat of the squad car parked nearby. Yet again, the woman who had viewed defendant twice returned to view defendant a third time while he was seated in the squad car with a light directed to his face. Defendant then was asked for additional identification, and he produced his driver's license. Shortly thereafter, defendant was taken to the station. Defendant testified that he had the impression he was under arrest after the officers frisked him and searched his vehicle, but that an arrest warrant was never produced.

At the hearing on the pretrial motions, Detective Fratus of the Lake County Sheriff's Department testified that on August 14, 1979, he and three other deputies, Detective Smith, Deputy Patrick Dunn, and Deputy Darus, were on a stakeout at the Smith Avenue Apartment complex in response to reports of a prowler and an assault and were "looking for a black male." During the stakeout, the officers observed a military vehicle driving through the complex. As the driver later approached one of the apartments being staked out (because of an earlier assault on the occupant), he paused and looked in the apartment for several seconds and then continued walking. Shortly thereafter, Fratus left the apartment and waited near the army vehicle. When defendant returned to the vehicle, the officers first questioned him and then conducted a search of his person and his vehicle. When initially questioned by Fratus, defendant was unable to tell Deputy Fratus which apartment he was looking for or the name of the person he sought to see. Fratus admitted that, at that time, he did not have an arrest warrant.

Robert Wolff testified that on August 15, 1979, at approximately 12:30 a.m., he was asked to identify defendant. Defendant was standing next to his car and flashlights were shined at his face. Wolff viewed defendant from a distance of 2 to 3 feet for approximately 30 seconds. He then told the officers that defendant looked shorter than a man who he had previously seen about the apartment complex. Several minutes later, Detective Smith approached Wolff and showed him defendant's military I.D. card. Wolff looked at the card and told Smith that the picture thereon was that of the man he had previously seen. Wolff admitted, however, that he felt pressure because he had been asked to make an identification. Also, he acknowledged that, even after making the identification of defendant, he had some doubt.

Wolff testified that on July 24, 1979, around midnight he had seen a

black male, later described as being approximately 6 feet tall, 200 pounds, with a big round face, and wearing a red satin shirt and red hat, loitering near the apartment complex. He observed that individual, identified at trial as defendant, from an approximate distance of 7 to 10 feet and spoke with him for 1½ to 2 minutes. He asked the man what he was doing there, and he replied that "he was looking for a black man and a white lady in the area * * *." Wolff then told the man to leave the apartment complex. Several minutes later, however, Wolff again saw that individual at a different location within the apartment complex. He spoke with him for 3 to 4½ minutes and never got closer to him than 15 feet. This time, the man said that his car wouldn't start and he needed a ride.

The victim, Mary Duke Harlan, testified that she was brought to the scene of the stop by Detective Smith and viewed defendant, first, while he was seated in the squad car and, then, when he stepped out of the vehicle. She viewed defendant from a distance of several feet while flashlights were used to illuminate him. After looking at defendant for several seconds while he was in the car, and up to a minute after he stepped out, she was unable to make a positive identification, although she testified he seemed "very familiar and like the same person that had been there before, very similar." She was hesitant then because he was in military uniform and looked shorter. She walked away and began talking with Robert Wolff. She was standing next to Wolff when the officers showed him the military I.D. card of defendant and when Wolff indicated that the picture thereon was that of the man he had previously encountered on July 24, 1979. Later she viewed the I.D. card of defendant and stated she was able then to determine with more certainty that he was the same man who she saw on July 24. Harlan then went to her apartment as she was "uptight," but shortly thereafter returned to the scene and viewed defendant again while he was seated in the squad car. This time she positively identified defendant as her assailant. On the following morning, she was shown a series of photographs of black men, and "picked out the person from the night before."

Harlan testified further regarding the assault as follows. In the early morning hours of July 24, 1979, she had been asleep for approximately 3 hours when she was awakened by voices outside her window. She recognized one of the voices as that of Robert Wolff, but could not recognize the other. She then started to doze off but was awakened by a man standing at the side of her bed. The only lighting at that time was a reflection from the kitchen light down the hall and from the pool area outside her window. Harlan observed her attacker for as long as a minute and a half at a distance of a few feet before she was ordered to bury her head in a pillow. He then forced her to submit to an act of deviate sexual conduct. She later described the assailant to police as a muscular black

male, approximately 30 years of age, 6 feet tall and weighing 200 pounds. The only unusual facial characteristic of her assailant which she noticed was a split between his teeth, although she couldn't remember whether she had told this to the investigating officer, nor was she certain she noticed this on August 15. Defendant did have such a split between his teeth.

David Harris testified that he was awakened by police on August 15 and asked to make an identification. When he arrived at the scene, he observed defendant standing next to a car illuminated by the headlights of a squad car as well as by "large hand lights." Harris identified defendant as the same individual he had observed at the apartment complex shortly after midnight on August 6, 1979. At that time, he had a conversation for approximately 2 minutes with a man who stood between two parked cars in the parking area of the complex. They were about 75 feet apart while they talked and there was lighting which came from behind the subject. Harris described the individual to deputies as a black male, approximately 5 feet, 10 inches tall, 180 pounds, in his twenties, and wearing a peach-colored shirt and grey slacks.

The next identification witness was Dan Dunn, a Lake County sheriff's deputy, who resided in the Smith Avenue Apartment complex. He testified that on August 15, 1979, he saw other deputies in the area and went over to a parked car and identified defendant, who was seated in the vehicle, as a person he had seen at the apartment complex on August 6, 1979, around midnight. On that date, he had seen a black male standing in the entranceway to one of the apartments near the mailboxes. When he asked him what he was doing, the man replied that he lived in the apartment building. Dunn later determined that no blacks lived in that building. When he saw defendant sitting in the squad car on August 15, 1979, he immediately recognized him as the same person he had observed on August 6, 1979.

Deputy Willie R. Smith testified that he participated in the stakeout, was present shortly after the defendant was stopped and advised him of his rights although he did not consider defendant in custody. Smith brought several witnesses, Wolff, Harlan and Harris, to view individually this defendant. His testimony concerning their viewing of the defendant is in substantial conformance with their testimony at the hearing. He stated that after the defendant had been identified by Wolff, Harlan and Harris, he informed him that he was under arrest for the previous incident. Regarding the stakeout, he testified that he was in the living room of Harlan's apartment when he saw the defendant approach and pause for a short period of time while peering in through sliding glass doors. Later when the defendant was stopped, Smith testified that he asked him who the friend was that he was looking for, and defendant said he could not

recall his name or address. Smith testified that defendant was taken to the Sheriff's office after he had been identified by all four witnesses. He stated that he gave *Miranda* warnings to defendant when he first arrived on the scene (prior to the identification) and upon arriving at the sheriff's office. Defendant denied ever receiving *Miranda* warnings, and Detective Smith admitted that he did not use a written acknowledgement and waiver of rights form at the station.

Deputy Patrick Dunn testified he was involved in the stakeout and that the officers were looking for a black male of medium height. He saw the defendant pass by a second apartment in which he was staked out, but the defendant walked by without any interest. About 10 to 15 minutes later, after Dunn had gone to the military vehicle, defendant then approached and he was stopped. While he was present during the subsequent viewing of the defendant by the other witnesses, he did not hear their conversations.

Deputy Michael Darus testified he also participated in the stakeout and observed defendant approach in his vehicle and later saw him walk by the apartment where he and Dunn were situated. He did not actively participate in the detention or questioning of the defendant.

County Detective Richard Whitemore testified that when defendant was later brought to the Sheriff's office, he took a picture of him and showed it to Harlan along with six other photographs. He further stated that Deputy Smith read defendant his *Miranda* rights and that they had a conversation.

Deputy Glen Jarzembowski testified that on July 24, 1979, he investigated Harlan's complaint about a breakin and sexual act performed on her. The description given him of the attacker by Harlan was of a black male, approximately 30 years of age, 6 feet tall and approximately 200 pounds. She was upset and, due to her condition, gave no more details. He talked with her about 10 minutes. Then he talked with Wolff, whose description of a person he had seen earlier was that of a black male in his 20's, approximately 5 feet 11 inches, 185 pounds with a big round face. He also returned to the scene on August 6 and talked with Dave Harris who complained about a prowler. Harris described that person as 5 feet 10 inches, 185 pounds and a black male in his 20's.

George Sullivan, a licensed private investigator, testified for the defendant. He took photographs of the apartment complex layout and testified to lighting in the area.

Following admission of the above testimony and argument of counsel, the trial court denied defendant's motion to quash the arrest and suppress statements. He subsequently denied the motion to suppress the identifications as well.

At trial, the following evidence pertinent to the issues raised on

appeal was introduced in addition to that summarized above which was substantially the same at trial. Mary Duke Harlan and her roommate, Debbie Kiddle, testified as to an earlier incident which occurred near midnight on June 12, 1979, after they had left a party at a neighbor's apartment. A Douglas Walsh was also present at the party and had made a sexual proposition to Harlan which was rejected. Harlan returned to her apartment and, shortly thereafter, a man appeared outside her sliding glass door and ordered her to lay down on the floor and pull her dress above her head. She fell to the floor and then ran out of the apartment screaming. Because of the poor lighting conditions, she was unable to describe the man other than to say that he was wearing a light shirt and dark pants and spoke in a clear-sounding, articulate voice. She denied ever telling investigating officers that a white male was the person. However, she stated she was upset at the time she talked with the officers and might have described his voice as sounding white, and she considered it possible at the time that Walsh, who was white, might have been involved. Deputy Bjorquist, however, testified that he spoke with Harlan the morning of the incident, that she was extremely upset and that she described the individual as male, white, approximately 6 feet tall with dark hair and a mustache. He did not recall whether Harlan's description of "white" was based upon the man's voice. Kiddle stated at trial that she did not see the individual, although she heard but did not recognize his voice. She also testified that about 5 minutes prior to the incident she had seen a white person she did not recognize in the pool area near her apartment. However, she admitted telling investigating officers that she believed the voice to be that of Douglas Walsh and she saw Walsh walking outside prior to the incident. She testified that putting two and two together she thought then that Walsh was responsible, but that was supposition. Kiddle further testified that her pocketbook was missing from the apartment after this episode.

Regarding the July 24, 1979, incident, Harlan testified that the assailant warned her not to run away as she had the last time and that he told her he had returned the purse which he took the first time. Harlan stated further that the assailant asked her for money and that she told him where he could find Kiddle's purse. Kiddle testified that her pocketbook was again taken during the July 24, 1979, incident.

Donald Owens, a friend of defendant, testified that he had introduced defendant to a friend of his, Duane Hill, in September 1978. Hill was nicknamed "Dewey." Owens stated that he saw defendant and Hill together on two occasions. He believed that Hill now lived in the State of New York.

Defendant testified that he was home on the evening of July 23, 1979, and that the only time he was at the Smith Avenue Apartments was in

October 1978 to see Dewey Hill, prior to being there on August 14, 1979, the date of his arrest. He further testified that on the evening of July 23, 1979, he had talked with his sister-in-law on the telephone, had watched a movie until 10 p.m., and then went to bed with his wife after the news. He described himself as 5 feet 8 inches tall, 180 pounds and with several spaces between his front teeth. He also testified as to his interrogation on August 15, 1979, and that he told one of the officers he had been looking for "Dewey."

Defendant's wife, Ernestine Canity, corroborated her husband's testimony regarding his whereabouts on July 23, 1979, and his testimony regarding the phone calls to his sister-in-law. (A phone record containing those calls was stipulated to and admitted into evidence.) She also stated that her husband had worn a mustache for more than a year and that he had not shaved or substantially trimmed it during that period of time.

Finally, Elizabeth Spencer, defendant's sister-in-law, testified to the two telephone conversations she had with defendant on July 23, 1979; one at approximately 7-8 p.m. and the other at approximately 10 p.m.

## I

■■ Defendant's first argument is that the trial court erred in denying his motion to suppress the identification testimony. Specifically, defendant contends that the court erred by failing to determine the reliability of each witness' identification on an individual basis, and by concluding that the identification testimony was reliable. While defendant cites no direct authority for the proposition that the trial judge is required to assess individually the reliability of each identification witness, we agree that such a requirement is implicit in the decisions. See *People v. Blumenshine* (1969), 42 Ill. 2d 508, 513-14, 250 N.E.2d 152.

From our review of the record, it appears that the trial court did examine individually the testimony of each of the identification witnesses with the exception of Robert Wolff. With regard to Wolff, the court clearly drew upon the strengths of some of the other identification witnesses to bolster the weaknesses of Wolff's testimony. In referring to Wolff's testimony, the court said: "I would have discounted his identification completely if it were by itself." Later, in response to defense counsel's request for a clarification, the court engaged in the following colloquy:

"THE COURT: If his was standing by itself without anything other than his own identification, I would have rejected the identification because of his lack of a certainty in testifying as to this being the person.

MR. WALTER: Okay. Then Your Honor in reaching the decision of Mr. Wolff's identification is looking at the identification of the other witnesses.

THE COURT: I'm mainly looking at the other witnesses * * *."

■■ Therefore, based on this record, we conclude that the trial court erred in aggregating the testimony of other identification witnesses to support the testimony of Wolff, and that Wolff's identification testimony was admitted improperly at trial. However, considering all of the evidence introduced at trial, we find this error to be harmless.

■■ As our supreme court said in *People v. Tranowski* (1960), 20 Ill. 2d 11, 17, 169 N.E.2d 347, 350:

> "It is not our policy to reverse a judgment of conviction merely because error has been committed, unless it appears that real justice has been denied or that the verdict of the jury may have resulted from such error."

Viewing the record herein, we cannot say that real justice has been denied or that the verdict of the jury may have resulted from admission of Wolff's testimony. In fact, on the contrary, considering the overall weakness of Wolff's identification testimony, it may have done more harm to the State's case than to defendant's case. Additionally, the identification testimony was, at best, cumulative since there were three other positive identification witnesses who testified at trial. Accordingly, we conclude that such error was harmless beyond a reasonable doubt. (*People v. Flemming* (1977), 47 Ill. App. 3d 755, 761, 362 N.E.2d 691.) Regarding the remaining identification witnesses, Harris, Harlan and Dunn, we believe the trial court analyzed their reliability separately and, therefore, did not err with respect to their testimony.

## II

Next, we consider whether the trial court erred in its ultimate conclusion that the identification witnesses' testimony was admissible under *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, and *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313. As we have already concluded that the court erred in admitting Wolff's identification testimony, we need not discuss the reliability of his testimony.

■■ ■ While it is the defendant's burden to establish that the pretrial confrontation was impermissively suggestive (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 511, 250 N.E.2d 152), once accomplished, the State may nevertheless overcome that obstacle, by a clear and convincing showing, based on the totality of the surrounding circumstances, that "the witness is identifying the defendant solely on the basis of his memory of events at the time of the crime * * *." (*Manson v. Brathwaite* (1977), 432 U.S. 98, 122, 53 L. Ed. 2d 140, 159, 97 S. Ct. 2243, 2257 (Marshall, J., dissenting); *People v. Lee* (1973), 54 Ill. 2d 111, 118, 295 N.E.2d 449; *People v. McTush* (1980), 81 Ill. 2d 513, 520, 410 N.E.2d 861.) Whereas a show-up of the type involved herein is unquestionably suggestive, as so

concluded in *Manion* (67 Ill. 2d 564, 572, 367 N.E.2d 1313), this alone does not demand exclusion of the resulting identification testimony. In *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, the Supreme Court rejected a *per se* test which would have excluded identification testimony without regard to reliability whenever it had been obtained through unnecessarily suggestive confrontation procedures. (432 U.S. 98, 110, 53 L. Ed. 2d 140, 151, 97 S. Ct. 2243, 2251; see also *People v. Manion* (1977), 67 Ill. 2d 564, 571, 367 N.E.2d 1313, 1316.) Instead, the court adopted the "totality of the circumstances" test of *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, which "permits the admission of the confrontation evidence if, despite the suggestive aspect, the out-of-court identification possesses certain features of reliability." (432 U.S. 98, 110, 53 L. Ed. 2d 140, 151, 97 S. Ct. 2243, 2251.) The five factors to be considered in determining the admissibility of a suggestive identification are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. *Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253. See also *People v. McKinley* (1977), 69 Ill. 2d 145, 152, 370 N.E.2d 1040, 1043; *People v. Manion* (1977), 67 Ill. 2d 564, 571, 367 N.E.2d 1313, 1317.

We turn now to an application of those factors to the case at bar. Harris testified that he observed an individual at the Smith Avenue Apartments around midnight on August 6, 1979, some 13 days after the crime was committed; that the individual was in the parking lot between two parked cars at a distance of 70 to 75 feet from Harris; that there was a light shining from behind the individual and that the two talked for approximately 2 minutes. Based on this episode, Harris described the suspect to the police as a black male in his twenties, 185 pounds, 5 feet 10 inches tall, and wearng a peach-colored shirt and grey slacks. When Harris saw defendant in the squad car on August 15, 1979, he immediately recognized him as the same man.

Referring to the *Manson* factors, Harris had an adequate opportunity to view the subject on August 6, 1979, in the apartment parking lot; he talked with the subject for approximately two minutes, thereby focusing his attention on him; his description of the subject was quite accurate; he demonstrated certainty in identifying defendant at the confrontation, and only 9 days had elapsed since he had last seen the subject.

Dan Dunn also testified that he saw the subject loitering about the apartment complex on August 6, 1979, near midnight. Dunn observed the subject from a distance of 2 to 3 feet in a lighted vestibule area of his building where he had a very brief conversation with him. Although there

is no evidence that Dunn communicated a description of this individual to police after seeing the man on August 6, 1979, at the hearing he described the subject as a pleasant looking, well-groomed black with short hair and a well-developed upper body, and wearing a peach-colored shirt.

When Dunn looked into the back of the squad car on August 15, 1979, he immediately recognized defendant as the man he had seen on August 6, 1979. Again, the *Manson* factors indicate the reliability of the identification testimony provided by Dunn: he had a good opportunity to view the subject on August 6, 1979, while he talked to him at a distance of 2 to 3 feet near a lighted vestibule; as a deputy sheriff, it can be expected that he had an extra degree of attention in talking to the subject; his description was quite accurate; he demonstrated a high level of certainty at the August 15, 1979, confrontation, and the time between the August 6, 1979, occurrence and the show-up was only 9 days, which could be expected to further insure the reliability of the confrontation.

The victim, Mary Duke Harlan, testified that she awoke shortly after midnight on July 24, 1979, and saw a man standing next to her bed. Her description of defendant was that the suspect was a muscular, black male, approximately 30 years of age, 6 feet tall, 200 pounds, with a split between his teeth. She looked directly at the man for several seconds while he spoke to her, and light was reflecting into the bedroom from the pool area of the apartment complex and from the kitchen light. On August 15, 1979, 22 days after the assault, she was brought outside to identify defendant as a suspect. Although she exhibited some initial doubt, after she went back in her apartment to relax, she returned to make a positive identification. While the defendant is shorter than initially described by her, there is evidence he had a split between his teeth and is about 185 pounds.

■■ Although the *Manson* factors do not weigh as favorably in Harlan's favor as they did for Harris and Dunn, they still point in the direction of reliability. She had a good opportunity to observe the assailant at a very close distance with her attention directed towards him; her description of the subject was reasonably accurate, although she thought he was taller than the defendant, and an unreasonable period of time had not elapsed between the crime and the confrontation. In considering the *Manson* factor concerning prior description, precise accuracy in description of the offender by an identifying witness is not a necessity. (*People v. Ramsey* (1979), 77 Ill. App. 3d 294, 298, 395 N.E.2d 973.) While she expressed initial hesitation at identifying defendant as her assailant, she returned to the scene shortly to make a positive identification. From the record it appears that her initial hesitance in identifying the defendant was because of her desire to be positive and her emotional state, rather than a complete lack of recognition. While it is a close question, we believe that the reliability of Harlan's identification testimony was established sufficiently

to permit the jury to consider it and make an independent determination thereon.

### III

The next argument advanced by defendant is that the trial court erred in denying his motion to quash the arrest and suppress the identifications made subsequent thereto. He contends that an arrest took place prior to any of the identifications since there was an actual restraint of his person and a submission to custody. Arguing that such arrest was accomplished absent probable cause, defendant insists that the arrest was illegal and the fruits thereof, the identifications, must be suppressed.

"An arrest is made by an actual restraint of the person or by his submission to custody." (Ill. Rev. Stat. 1979, ch. 38, par. 107—5(a).) And, a police officer may arrest a subject when:

"(a) He has a warrant commanding that such person be arrested; or

(b) He has reasonable grounds to believe that a warrant for the person's arrest has been issued in this State or in another jurisdiction; or

(c) He has reasonable grounds to believe that the person is committing or has committed an offense." Ill. Rev. Stat. 1979, ch. 38, par. 107—2.

Under section 107—14 of the Code of Criminal Procedure, however, a person may be stopped for temporary questioning, absent probable cause, under certain circumstances:

"A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102—15 of this Code, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped." (Ill. Rev. Stat. 1979, ch. 38, par. 107—14.)

Furthermore, when an officer has stopped a person for temporary questioning and "reasonably suspects that he or another is in danger of attack, he may search the person for weapons." Ill. Rev. Stat. 1979, ch. 38, par. 108—1.01.

■■■ Contrary to defendant's assertion, we do not believe that defendant was under arrest prior to, or during, the show-ups. Rather, we conclude, as did the trial judge who passed upon the credibility of the officers who testified defendant was not under arrest, that defendant was stopped lawfully for temporary questioning pursuant to section 107—14 of the

Code of Criminal Procedure (Ill. Rev. Stat. 1979, ch. 38, par. 107—14) and was not placed under arrest until after being positively identified by Harris, Dunn and Harlan. (See *People v. Roberts* (1981), 96 Ill. App. 3d 930, 422 N.E.2d 154, 156-57.) And, although the defendant and his vehicle were searched before the show-ups, under all the facts present here we do not find that this action by the sheriff's deputies was sufficient to constitute an arrest. He was not handcuffed during the course of this identification procedure, which tends to indicate he was not under arrest, and Deputy Smith testified he would have been released and their stakeout resumed had he not been identified. Thus, the officers need not have had probable cause to justify the detention of defendant, only specific and articulable facts which, taken together with rational inferences therefrom, make the intrusion reasonable. (*Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880; *People v. Rogers* (1979), 71 Ill. App. 3d 1046, 1049, 390 N.E.2d 542, 544.) Or, as our statutory provision requires, the officers must be able to reasonably infer "from the circumstances that the person is committing, is about to commit or has committed an offense * * *." (Ill. Rev. Stat. 1979, ch. 38, par. 107—14.) Given the facts available to the officers on August 14, 1979, while they were engaged in a stakeout at the Smith Avenue Apartments: that the suspect was a black man and no blacks lived in the complex, that it was late at night, and that the defendant stopped momentarily in front of the victim's apartment and then walked away, we believe there was sufficient justification for the initial stop of defendant. (See *People v. Herron* (1980), 89 Ill. App. 3d 1048, 412 N.E.2d 1365.) While a stop allowable under *Terry* does not authorize the search of the person detained nor a search of the person's nearby vehicle absent additional circumstances which allow a law enforcement officer to reasonably suspect that he or another is in danger of attack, which we find are not present in the instant case, no evidence was obtained as a result of the search of the defendant and his vehicle. Accordingly, while such a search was not permissible, it does not under these circumstances affect the otherwise lawful detention.

■■ The more difficult question which must be addressed is whether the officers exceeded their authority under section 107—14 (Ill. Rev. Stat. 1979, ch. 38, par. 107—14) by detaining defendant for a period of time while witnesses were brought to the scene, and then by requiring defendant to submit to several show-ups. There is nothing in the record to determine with certainty how long defendant was detained, but the State, in its brief, estimates the time period to have been 10 to 15 minutes. From our examination of the record it appears that the questioning by officers was brief and the witnesses were immediately brought to the squad car for possible identification.

Considering just the duration of the detention, we find no difficulty

concluding that the stop was for "a reasonable period of time" (Ill. Rev. Stat. 1979, ch. 38, par. 107—14). While each case must be decided on its own unique facts and circumstances, we believe that absent any showing in the record of any delay in bringing the witnesses to the scene or any positive evidence of the length of time involved here, this was not an unreasonable length of time for a temporary detention. (See *People v. Mathis* (1977), 55 Ill. App. 3d 680, 371 N.E.2d 245, where the court found a 10-minute detention to be reasonable.) Also, as noted by Professor LaFave in his treatise on the law of search and seizure, the American Law Institute's Model Code of Pre-Arraignment Procedure provides that a temporary detention may last for a reasonable period not to exceed 20 minutes. See 3 LaFave, Search and Seizure §9.2, at 37 (1978).

Finally, we do not believe that the officers exceeded their authority under section 107—14 (Ill. Rev. Stat. 1979, ch. 38, par. 107—14) when they brought the witnesses to the scene of the stop to view defendant. It is significant that when initially stopped and questioned, the defendant was unable to tell Deputy Fratus which apartment he was looking for or the name of the friend he sought to see. As mentioned above, the show-ups did not involve an unreasonably long period of detention and, by bringing the witnesses over to the scene, the officers ensured an expeditious resolution of their investigation. Such action is consistent with the purposes of a temporary stop and did not, in our opinion, exceed the bounds of section 107—14 (Ill. Rev. Stat. 1979, ch. 38, par. 107—14). See *People v. Thomas* (1973), 9 Ill. App. 3d 1080, 293 N.E.2d 698; 3 LaFave, Search and Seizure §9.2, at 37 (1978); compare *People v. Lippert* (1980), 93 Ill. App. 3d 273, 415 N.E.2d 1064.

## IV

Next, defendant argues that the trial court erred in ruling on certain evidentiary matters. Specifically, the alleged evidentiary errors complained of are: (1) that the court permitted Harris to testify that on August 6, 1979, at 1 a.m., he received a phone call from a neighbor, Mrs. Portillo, who told him that someone was trying to get into her apartment, and (2) that the court permitted the victim, Harlan, to testify that she thought her assailant had a knife in his hand.

■■ With regard to the first evidentiary matter, in addition to testifying as to the conversation with Mrs. Portillo, Harris went on to relate that, after receiving the phone call, he went outside and saw a black man in his twenties loitering in the parking lot. That same individual was identified by Harris on August 15, 1979, as defendant. 'The trial court permitted Harris to testify concerning the telephone conversation but instructed the jury not to consider the truth or falsity of the statement. This was not error. The evidence was introduced for the sole purpose of showing that

Harris went outside in response to the call, and at that point observed defendant in the parking lot. Under these facts, this testimony falls outside the category of hearsay. (*People v. Devine* (1977), 55 Ill. App. 3d 576, 578-79, 371 N.E.2d 22; see also Cleary and Graham, Handbook of Illinois Evidence §801.5 (1979).) Since the testimony was introduced for a purpose other than to prove the truth of the matter asserted, it was properly ruled admissible. (See *People v. Klisnick* (1979), 73 Ill. App. 3d 148, 160, 390 N.E.2d 1330, 1338.) Even were it to be considered error, however, it would certainly be harmless in light of the other evidence introduced.

■■ ■ Nor does the second claimed evidentiary error constitute an abuse of discretion. Mary Duke Harlan testified that she heard a "flicking" sound during the assault. Over objection by defense counsel, the trial court permitted her to testify that she felt that the sound was coming from a knife, even though she never saw a weapon of any kind. We believe there was sufficient foundation in the record for the admission of this testimony. We do not view this as a matter sufficiently beyond common experience so that only persons of skill or experience are capable of forming a correct judgment. (See *People v. French* (1978), 59 Ill. App. 3d 353, 356, 375 N.E.2d 502.) As the State points out in its brief, nonexpert lay witnesses are allowed to give opinion evidence on a variety of matters, including estimates of speed, size, weight and color. (See *People v. Burton* (1972), 6 Ill. App. 3d 879, 886, 286 N.E.2d 792, 797.) While Harlan's testimony is somewhat distinguishable from these types of opinions, we conclude that it is admissible for the same reasons in view of the more recent trend to allow nonexpert opinion if there is some evidentiary basis in the record for it. (McCormick, Evidence §11, at 25 (2d ed. 1972); *Law v. Central Illinois Public Service Co.* (1980), 86 Ill. App. 3d 701, 705, 408 N.E.2d 74.) Additionally, the testimony was admissible in that it tended to show that the act was performed "by * * * threat of force," a material element of the offense charged. Ill. Rev. Stat. 1979, ch. 38, par. 11—3(a).

## V

Finally, defendant argues that the evidence introduced by the State at trial was insufficient to prove him guilty beyond a reasonable doubt. We believe that this issue also must be resolved against the defendant. The identification testimony of the victim, Mary Duke Harlan, was positive even though at her initial confrontation of the defendant on August 15 she did not positively identify him immediately. This was adequately explained by her at trial and was attributable to her emotional state and her desire to be positive.

It is clear that where identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though contradicted

by the accused, provided the witness is credible and viewed the accused under such circumstances as would permit a positive identification to be made. (*People v. Stringer* (1972), 52 Ill. 2d 564, 569, 289 N.E.2d 631; *People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 697, 402 N.E.2d 915.) Two other witnesses, Harris and Dunn, placed defendant at the scene on a subsequent evening through their positive identifications contrary to the defendant's testimony which was that he hadn't been there that recently. While the defendant and his wife testified that he was home on the night in question, this was a factual issue for the jury. When "the evidence is irreconcilably conflicting, it is the peculiar prerogative of the trier of fact * * * to ascertain the truth." (*People v. Hammond* (1970), 45 Ill. 2d 269, 278, 259 N.E.2d 44.) A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses, and will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313.) The apparent discrepancies in the identification of the intruder on June 13 by Harlan and Kiddle, which had originally been believed by them to have been a white male, is easily explainable because of the sexual proposition made to Harlan by Walsh shortly before the incident and their theorizing then that he was the logical intruder. Nor is the defendant's explanation of why he was at the apartment complex around midnight on August 14 sufficient to provide a reasonable doubt of his guilt. According to the officers, he was unable to name the friend he was trying to find or to point out his apartment. Nor did the friend testify at trial. The jury had before it his version of why he was there. When a defendant elects to justify or explain his presence at or near the scene of a crime, while denying participation, he must tell a reasonable story or be judged by its improbability. (*People v. Spagnolia* (1961), 21 Ill. 2d 455, 458, 173 N.E.2d 431.) Although his presence on August 14 was not on the night of the crime, we believe it was for the jury to determine from the evidence whether his explanation of his reason for being there at that hour and his walk through the complex were worthy of belief in view of all the evidence in the case. The defendant was proved guilty beyond a reasonable doubt and, accordingly, we affirm the judgment of the circuit court of Lake County.

Affirmed.

SEIDENFELD, P. J., and HOPF, J., concur.