**UNITED STATES ex rel. Walter CANITY, Petitioner,**

v.

**Michael LANE, Director of the Illinois Department of Corrections; John Heckel, Warden, Vandalia Correctional Center, and Neil Hartigan, Attorney General of the State of Illinois, Respondents.**

**No. 83 C 641.**

United States District Court, N.D. Illinois, E.D.

Aug. 31, 1983.

Stephen E. Walter, Walter & Smoker, Waukegan, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen. by Maureen Cain, Asst. Atty. Gen., Chicago, Ill., for respondents.

## MEMORANDUM ORDER

BUA, District Judge.

This case is before the Court on a petition for a Writ of Habeas Corpus. 28 U.S.C. § 2254. Now pending is the respondents' Motion for Summary Judgment. For the reasons stated herein, summary judgment is granted for the respondents.

On April 11, 1980, Petitioner Walter Canity was tried by a jury in the Circuit Court of Lake County, Illinois and found guilty of the offenses of deviate sexual assault, Ill. Rev.Stat.1979, ch. 38, par. 11–3(a), and burglary, Ill.Rev.Stat.1979, ch. 38, par. 19–1(a). After the Circuit Court vacated the burgla-

ry conviction, petitioner was sentenced to a term of six years in the Department of Corrections on the sexual assault charge. The conviction was affirmed in the Illinois Appellate Court. *People v. Canity,* 100 Ill. App.3d 135, 55 Ill.Dec. 445, 426 N.E.2d 591 (2nd Dist.1981). After a petition for leave to appeal to the Illinois Supreme Court was denied, petitioner filed this lawsuit.

Petitioner's conviction arose out of an incident which occurred in the early morning hours of July 24, 1979. On that date, Mary Duke Harlan was awakened from her sleep by voices outside of her window, one of which she recognized as that of Robert Wolff, a witness at petitioner's trial. As she began to doze off, she was again awakened, this time by a man standing at the side of her bed. In the light from the outside pool and that reflecting from her kitchen, she was able to observe this man for roughly a minute and a half. He then ordered her to bury her head into her pillow and submit to an act of deviate sexual conduct.

She later described her attacker as a black male, approximately six feet tall, roughly 30 years old, and weighing 200 pounds. She testified that he had a gap between his front teeth; however, it does not appear that this characteristic was given to the investigating officers. Defendant does, indeed, have a gap between his teeth. He testified that he is five feet, eight inches tall and weighs 180 pounds.

On August 6, 1979, a black male was observed at the apartment complex by David Harris and by Lake County Sheriff's Deputy Dan Dunn. Harris spoke with the man for about two minutes from a distance of about 75 feet. He described the individual as being five feet, ten inches tall and weighing roughly 180 pounds. He estimated that the individual was in his twenties and noted that he was wearing a peach-colored shirt with grey trousers.

Dunn first saw the man standing next to the mailboxes in the entranceway to the apartment complex. When first asked what he was doing, the man replied that he lived in the building. However, Dunn later determined that no blacks lived in the building.

During the evening of August 14, 1982, and into the following morning, the Lake County Sheriff's Department was involved in a stake-out of the apartment complex where Harlan, the victim of the assault, resided. The stake-out was undertaken in response to reports of a black prowler. Sometime around midnight, petitioner, who was employed as a U.S. Army recruiter, drove an army vehicle into the parking lot at the apartment building. After parking the vehicle, he began walking around the building. He testified that he was looking for the building in which a friend of his lived. Once he realized that he was unable to determine which building the friend lived in, he began to return to his car. He then realized that the friend might have been living in a building in the complex which he had not previously seen and went by that building. Again unable to find his friend, he started back toward his car. Once he reached the car, he was approached by two individuals who identified themselves as deputy sheriffs and asked him for identification. He gave the officers his military identification card. One officer then said to the other, "Hold him here while I go get the witnesses." Two men were then brought to look at the petitioner while he was illuminated by flashlights and told to stand in various positions. Two women also viewed the defendant. One of them, the victim Mary Harlan, returned two more times to view the petitioner, once when he was seated inside the police car.

## I.

Petitioner now makes two claims. First, he asserts that his conviction is based on improperly admitted identification testimony which was secured as a result of an impermissibly suggestive show-up procedure.

■ In *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Court rejected a *per se* test which would have excluded all identification testimony

regardless of reliability whenever it had been obtained through confrontation procedures which were deemed to be unnecessarily suggestive in favor of a "totality of the circumstances" test. Under the totality of circumstances test, confrontation evidence is admitted if, despite being suggestive, "the out-of-court identification possesses certain features of reliability." 432 U.S. 98, 110, 97 S.Ct. 2243, 2251, 53 L.Ed.2d 140. The factors upon which the reliability determination shall be made are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Against these factors, this Court must weigh the corrupting effect of the suggestive identification itself. 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140.

█ In the instant case, two of the identification witnesses placed the petitioner at the scene of the assault on the night of the incident, while the other two merely identified him as an individual they had seen prowling around the building some 13 days later. Utilizing the *Manson* standards, the identification testimony of the witnesses who claim to have observed petitioner nearly two weeks after the attack was clearly properly admitted.

The testimony of Mr. Harris clearly reveals that his identification of the petitioner was reliable. As the Illinois Appellate Court noted, Harris had sufficient opportunity to view the criminal as petitioner was standing near a light and was only 75 feet from the witness during their two-minute conversation. Because the witness and petitioner were engaged in conversation, the witness' attention was undoubtedly focused on petitioner. Furthermore, Harris' description of petitioner was quite accurate and the identification was made with a high degree of certainty. Finally, only nine days elapsed between the time Harris first saw petitioner and the identification. In view of these factors, even if Harris' identifica-

tion of petitioner was unnecessarily suggestive, it was clearly reliable and therefore properly admitted into evidence.

The identification testimony of Dan Dunn also was clearly reliable. He saw petitioner from a distance of two or three feet in a lighted hallway wherein Dunn spoke with petitioner. Clearly, his opportunity to view defendant was good and his degree of attention was high. In addition, while he did not describe the individual he had seen on August 6, 1979 at the time of the identification, when, at the pre-trial hearing, he did describe the prowler, his description quite accurately described petitioner. He was quite certain of the identification and, like Harris, made the identification but nine days after first viewing petitioner. Like the identification testimony of Harris, Dunn's identification evidence was properly admitted under the factors set out in *Manson*.

█ Not so obvious, but nevertheless reliable and therefore admissible was the identification of petitioner given by the victim, Mary Harlan. At the time of the crime, Harlan had a clear opportunity to view the criminal. She testified that he stood over her bed for one and a half minutes before attacking her and in that time was illuminated by light from the kitchen and from the pool outside. Undoubtedly, during this period, her attention was acute and singularly focused on her assailant. Her description of her assailant, while not exact, nevertheless reasonably described the petitioner.

When Harlan was brought to the squad car to view the petitioner, she expressed some hesitation at identifying him because of his military uniform and because he seemed shorter than she had remembered. Nevertheless, she testified that even at this initial viewing he seemed quite familiar. Later, she was standing by Robert Wolff when Wolff viewed petitioner's military identification card and recognized petitioner as the man he had encountered on July 24, 1979. Shortly thereafter, Harlan viewed the identification card and stated that she was then more certain that petitioner was her assailant. After returning

to her apartment for a short period of time, Harlan returned to the squad car, viewed petitioner in the squad car, and identified him as her assailant. The following day, she was shown a series of pictures of black men and again picked petitioner out as her assailant.

When Harlan finally identified petitioner as her assailant, she was apparently quite certain of the correctness of the identification. Indeed, the delay between the initial viewing and the eventual identification was apparently necessitated by Harlan's desire to be absolutely sure that the petitioner was her assailant.[1]

Harlan's identification of petitioner came some 22 days after the assault. While such a period of time is somewhat less than ideal, it nevertheless was not unreasonable.

 Viewed *in toto*, Harlan's identification of petitioner as her assailant was reliable under the factors set out in *Manson* and therefore was properly admitted. Furthermore, because the testimony of Harlan was properly admitted, this Court need not reconsider admission of the identification testimony of Wolff which the Illinois Appellate Court held to be improperly admitted. The admission of such evidence was harmless error as it was merely cumulative to the identification evidence offered by Harlan.

Because the identification evidence received in the trial court was sufficiently reliable to overcome any suggestive aspects it may have possessed, such evidence was properly admitted under *Manson* and no violation of constitutional rights can be said to have emanated therefrom.

## II.

 Petitioner also claims that he was placed in custody and under arrest without probable cause for such arrest. The Illinois Appellate Court concluded that petitioner was not placed under arrest until after he had been identified by Harris, Dunn, and Harlan and that his detention before such identifications were obtained was permissible under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, detention of an individual is warranted if specific and articulable facts, when considered with all reasonable inferences which can be made therefrom, justify the intrusion. *Id.* at 21, 88 S.Ct. at 1879–80.

 Petitioner does not claim that he was convicted based upon evidence which was procured as a result of the allegedly illegal arrest,[2] but merely asserts that his illegal detention warrants habeas relief. However, an illegal arrest by itself is not cognizable under 28 U.S.C. § 2254. *Crowell v. Zahradnick*, 571 F.2d 1257, 1259 n. 2 (4th Cir.1977); *U.S. ex rel. Pella v. Reid*, 527 F.2d 380 (2nd Cir.1975). Only when evidence introduced at trial which arose from the illegal arrest is challenged is the illegal arrest pertinent. *Crowell v. Zahradnick, supra; Johnson v. Beto*, 466 F.2d 528 (5th Cir.1972). Thus, even if the Court accepts petitioner's claims regarding the arrest as true, habeas relief may not issue.[3]

### Conclusions

For the reasons stated herein, the Court concludes that no genuine issue of material fact remains. Summary judgment is therefore entered for respondents.

IT IS SO ORDERED.

---

1. To the extent that Harlan's identification was uncertain or otherwise unreliable, such characteristics would tend to vitiate the weight of the evidence and, accordingly, be discounted by the finder of fact. *Manson*, 432 U.S. 98 at 112, 97 S.Ct. at 2252.

2. Even had petitioner made such a claim, habeas relief could not be afforded unless it was apparent that the state had denied petitioner the opportunity for a full and fair hearing on his fourth amendment claims. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

3. Petitioner claims that his detention was not a *Terry* stop but an arrest because he was detained, he claims, for "in excess of one hour," during which time his vehicle keys and identification cards were removed from him.