THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
OLLIE STATEN, JR., Defendant-Appellant.

Second District   No. 2—82—0273

Opinion filed June 3, 1986.—Rehearing denied July 1, 1986.

1040

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Marshall J. Hartman, Public Defender, of Chicago, for appellant.

Daniel Doyle, State's Attorney, of Rockford (Patrick Delfino and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

A two-count indictment filed in the circuit court of Winnebago county charged defendant, Ollie Staten, Jr., with murder in the December 31, 1980, shooting death of Randall Blank, a Rockford police officer. The first count alleged that defendant shot and killed Blank with intent to kill or do great bodily harm (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)). The second count alleged that defendant shot and killed Blank with intent to kill or do great bodily harm and that at the time of the shooting defendant was over the age of 18 and knew or should have known that Blank was a peace officer engaged in the course of performing his official duties (Ill. Rev. Stat. 1979, ch. 39, par. 9—1(b)(1)). Following a jury trial, defendant was found guilty of both counts. At the request of the State, a separate sentencing hear-

ing was held to determine whether defendant should be sentenced to death. Although the jury found the existence of a statutory aggravating factor (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(1)), it could not unanimously agree to impose the death penalty. Subsequently, the trial court sentenced defendant to natural life imprisonment.

In the early morning hours of December 31, 1980, defendant was at the Stage Door Lounge in Rockford, with a friend, Robert Hockett. Janet Mayfield was also at the lounge with her boyfriend. Mayfield had to go to the restroom, so she put her purse down near some coats and other purses just outside the restroom door. When she came out a few minutes later, her purse was gone.

Randy Rosploch, who was in charge of coat checking for the Stage Door Lounge, saw defendant walk out of the lounge with something under his coat, which Rosploch thought was a purse. Rosploch followed defendant outside and saw him talking to a police officer, who Rosploch later identified as Blank. At the time Blank was wearing a uniform. Rosploch told the police officer to check under defendant's coat. At that point defendant began to run away with Blank in pursuit. Blank took out his portable radio and notified the police dispatcher that he was chasing a black male wearing a blue jacket and blue stocking cap for a possible theft of a purse.

During the chase Blank kept the police dispatcher apprised of his route. Blank chased defendant through a number of alleys and eventually caught him at the intersection of State and Madison, where the two began to scuffle. Over his radio Blank told the dispatcher that he was down. His last transmission ended with the words, "The gun."

Jerome Young and Paul Bahr, two workers for the Milwaukee Railroad, were drinking a pitcher of beer at a bar known as the Hideaway Tavern, which was located on State Street in Rockford. At approximately 12:30 a.m., Young and Bahr left the tavern. As they walked east on State Street toward the intersection of State and Madison, they observed two men struggling. Young testified he saw one of the men flip the other over his shoulder, and then the other man flipped the first one over his knee. One of the men said, "He has got my gun." At this point one of the men was on the bottom, and the other was standing up, pointing down at the man on the ground. They then scuffled a little more, and Young heard a shot. Young saw the man that had been on the bottom fall into the street. The other man then reached down and picked up something and ran. Young stated that when he heard the shot, the man who was down "was on his knees, on his one knee or butt" and the other man was

standing over him about an arm's length away.

Bahr, who was a few steps ahead of Young, did not hear anything about a gun, and although he heard some words he could not make out what the men said from where he was standing. Bahr recounted that after the one man was flipped, the two men continued to struggle. Bahr said he then heard a shot and saw the man who was standing pick up something that looked like a bag and run away.

Within a minute of the shooting Officer Kenneth Carner arrived at the scene in a squad car. Young and Bahr showed Carner the man who lying in the street. Bahr stated that once the lights on the squad car were on the man, they could see that he was a police officer, before that it had been too dark to tell.

Carner testified he found Blank, shot in the forehead, gasping for breath. Blank was lying face down with his portable radio by his head. Around his waist was his night stick and along the curb was his flashlight. His revolver was missing, but he was wearing his holster. Under his body was a spent shell fragment. Carner also found two hats in a nearby alley: one was a stocking cap, and the other was the officer's cap. Carner testified he questioned Young and Bahr at the scene. On cross-examination Carner stated that both men informed him that they had seen two men go down on the ground. They then heard a shot and saw one of the men get up and run away. Carner further testified that one could not remove a Smith & Wesson .357 magnum from a holster without unlocking the holster clasp.

Gregory Hanson, a Rockford police officer, was on patrol on the morning of December 31, 1980. At approximately 12:30 a.m. he heard a radio transmission from Blank. Hanson immediately responded to the call and proceeded to the intersection of State and Madison. When he turned west on Market Street, about a block from the Stage Door Lounge, he observed a Mercury automobile driving east. As the Mercury approached, Hanson noted that the vehicle was occupied by two black males: the driver was wearing a blue jacket, and the passenger was wearing a dark colored jacket and a light blue stocking cap. Hanson made a U-turn and followed the Mercury until it turned into the parking lot of a restaurant known as the Sandwich Factory. Hanson parked to the left of the Mercury and observed the passenger, later identified as Robert Hockett, get out of the car and begin to walk toward the restaurant. As Hanson approached the Mercury, defendant got out of the driver's side. When asked for his driver's license, defendant stated that he did not have a license. Hanson testified he noticed a "fleshy material" on defendant's face and

that defendant was breathing heavily and had difficulty speaking. Hanson stated he patted both men down. Although he found no weapons, he put defendant and Hockett in the back seat of the squad car. Hanson testified he then walked over to the Mercury and stood by the driver's door. Shining his flashlight in the window, Hanson saw a revolver on the floor behind the driver's seat. The revolver had black rubber grips and a silver disc on the side of one of the grips. Hanson said he recognized the revolver as belonging to Blank. He was familiar with Blank's weapon, he said, because his locker was next to Blank's at the police station. Hanson testified he also shined his flashlight into the front seat area of the vehicle and observed a brown purse on the floor in front of the passenger seat. At that point Hanson informed the dispatcher that he had two suspects in custody, and other officers arrived to assist him.

The evidence also showed that a print of defendant's second joint of his left ring finger was found on Blank's gun. The print was located in front of the trigger guard. A fingerprint expert testified that it was not possible to lift any prints from the trigger of Blank's gun because of its rough surface.

Richard Beishar, a sergeant with the Rockford police department, performed a prima-residue test on defendant's hands to determine if he had fired the gun. Although Beishar found residue on defendant's hands, he could not say whether defendant had actually fired the weapon. He admitted that, depending on the location of defendant's hands when the weapon discharged, residue could be present even if defendant did not fire the gun. He also did not know whether Blank had fired his revolver that night since no one had conducted tests on Blank's hands.

Special Agent Donald Havecost of the Federal Bureau of Investigation conducted a series of tests not only on the residue which was found on defendant's hands but also on Blank's revolver. Although he could not say specifically where defendant's hands were located when the weapon discharged, Havecost testified that in his opinion, based upon the tests, they "were behind the cylinder of the firearm and were in a position with the butt of the firearm facing him." Havecost could not give an opinion, however, on whether defendant had pulled the trigger.

Paul Muenkel, a detective with the Rockford police department, took a number of photographs of the scene of the incident and testified as to the location of various street lights. According to Muenkel there are street lights on all four corners of the intersection of State and Madison. These lights were on, Muenkel said, when he arrived at

the scene at approximately 1 a.m. Muenkel further recounted that another street light is situated about 4 feet from the alley which turns west from Madison Street where the two hats were found. There was also a street light directly across the street from the Stage Door Lounge. These lights were also on, Muenkel testified, when he took photographs of the locations at approximately 2:30 a.m.

Robert Hockett testified that he was with defendant at the Stage Door Lounge on December 31, 1980. Hockett said he went to the bathroom, but when he came out defendant was not around, so he went outside to look for him. Hockett said he saw defendant talking to a man in a blue uniform who appeared to be a police officer or a security guard. He had a uniform-type cap on and an emblem on his sleeve. Hockett stated that they were facing one another about 3 or 4 feet apart. Hockett, however, could not hear what they were saying from where he was standing. Defendant, he said, was wearing a blue coat and a stocking cap. Hockett explained that he walked to the car, assuming that defendant would follow him. When he got to the car, though, defendant was nowhere in sight. Hockett testified he walked back toward the Stage Door Lounge and then saw defendant come out of an alley. Hockett said defendant told him that he thought he had just shot someone. The two men then got in the car, and on the way to Hockett's home they stopped at the Sandwich Factory.

Detective Rolland Donnelli of the Rockford police department first saw defendant in the police station at about 1:20 a.m. Defendant was in a holding cell when Donnelli and another detective, Charles Bishop, approached. According to Donnelli, defendant yelled out, "Let the other guy go, I shot him." At this point Donnelli removed defendant's handcuffs and he and Bishop took defendant into an interrogation room. Using a waiver form, Donnelli advised defendant of his rights. Defendant agreed to talk to the detectives but refused to sign the waiver form, saying that his mother had told him never to sign anything. Donnelli testified that defendant admitted to stealing a purse at the Stage Door Lounge and to shooting Officer Blank. Defendant, however, claimed that he did not realize that Blank was a police officer until after the shooting.

Clarence Lafler, the pathologist who performed the autopsy, testified that Blank died of a gunshot wound to the head. Lafler said the bullet entered the forehead and exited at the back of Blank's head. Although it was difficult to determine the exact angle of the bullet's path, Lafler stated that it traveled at a slightly downward angle,

"maybe five or ten degrees."

The record reveals that the State intended to call Karen Welch, the police radio dispatcher, as its final witness. The trial court had earlier excluded from evidence the tape recording of Blank's running account of his chase of defendant due to its poor quality. The court had ruled, however, over defendant's objection, that Welch could testify concerning her recollection of what she had heard over the radio, based upon her memory and review of the tape. Once his motion to exclude Welch's testimony was denied, defendant agreed to let the court read the following stipulation to the jury:

"Karen Welch is a dispatcher at the Rockford Public Safety Building Communications Center, her dispatch code is Control 4. She was on duty working as a dispatcher on December 31, 1980, at 12:30 A.M. At that time she received a police radio transmission from Rockford Police Officer Randall Blank. His transmitting code was 'Ocean 19.' She recognized his voice as he began transmitting to her. His first transmission to her was made at 35 seconds after 12:30 A.M. The following is her account of the transmission between her and him beginning at that time:

'RB: Control 4, Ocean 19.

KW: Go ahead 19.

RB: Send me a unit to be 10-60 Stage Door.

KW: Any East side unit by Stage Door, advise.

RB: I've got a subject running from me in the alley going east on—toward State.

KW: 10-4. Units, Ocean 19 has a subject running east from the Stage Door in the alley toward State.

RB: Negro male, blue coat, blue stocking cap; believe he just stole a purse.

KW: 10-4. Believe it's a possible strong arm, blue coat, blue stocking cap.

RON CAREY: X-Ray 63 and 73 is enroute.

KW: 10-4. Units, don't advise me further; keep the channel clear for him.

RB: On Market Street now.

KW: He's on Market.

RB: Correction: Madison, still running through the alley.

KW: Madison through the alley.

RB: Down.

RB: Needs assistance

KW: Needs assistance right away.

RB: Madison and State.
KW: He's at Madison and State.
RB: ? ? ? gun.
RB: Ocean 19, Control 4.
RB: —open mike—(noises)
KW: Ocean 19, where you at?
RB: Madison and State.
KW: Madison and State.
RB: the gun.' "

Defendant, testifying in his own behalf, recounted that he was at the Stage Door Lounge with Hockett on December 31, 1980. After listening to music, he walked around the club and saw a purse near the women's restroom. He placed the purse under his arm and walked outside to the alley to relieve himself. He then began to inspect the purse, but before he could do so he heard someone shout, "Hey, you." Fearing that it was the bouncer or someone connected with the purse, he began to run down the alley. He ran for almost half a block and turned down another alley toward Madison Street, all the while being chased. Defendant said he ran across Madison Street into another alley where he slipped and fell on the ice. The man who was chasing him fell over him and grabbed his hat off. Defendant claimed he did not get a look at the man because there were no lights in the alley. Defendant said he managed to escape and ran out of the alley onto Madison Street when he heard the man who was chasing him yell, "Stop, I got a gun. If you make another move, I'll blow your ass away." Defendant testified he stopped, heard the man run up behind him and cock a gun, and, thinking he would be shot, turned and grabbed the arm that was holding the gun. Defendant further testified that as he struggled for possession of the weapon, he fell and that the other man fell on top of him. According to defendant, when they hit the ground the gun discharged. Defendant said the gun went off as he was trying to twist it out of the other man's hand. Defendant explained that after the gun went off, he got up and found that he had the gun in his hand. He then picked up the purse and ran back to the Stage Door Lounge where he met Hockett.

Defendant further recounted that when he was taken to the police station, he was crying and upset, a fact corroborated by the testimony of Detective Donnelli. Defendant testified that he told the police to let Hockett go, saying that he would tell them what happened. He gave the police a written statement, but when he read what they had written down he refused to sign it because it was incomplete.

Under cross-examination, defendant admitted that he intended to steal the purse he found by the women's restroom. However, he denied speaking to Blank in front of the Stage Door Lounge. He also said that he did not know that the man who was chasing him was a police officer until a plainclothes detective grabbed him around the throat and told him that he ought to kill him for what he did to Blank. Defendant claimed he did not see Blank's holster, night stick, flashlight or portable radio. He also denied telling Hockett that he had shot someone. He further denied telling the police that he picked a gun up off the street and shot Blank. Rather, he claimed he told the police that the gun discharged accidentally during the struggle.

Defendant called two Rockford police officers, Thomas Nimmo and Dominic Iasparro, to testify. Both officers stated that when they questioned Hockett about 30 minutes after the incident, he did not tell them that he had seen defendant talking to a man in a uniform outside the Stage Door Lounge. On cross-examination both officers testified that when they originally questioned Hockett shortly after the incident, they did not ask him whether he saw defendant talking to anyone outside the Stage Door Lounge.

Defendant also called Leonard Miller, a traffic control supervisor for the city of Rockford, to the stand. Miller testified that two of the four 400-watt mercury vapor bulbs were removed from the corner of State and Madison on April 21, 1980, and were not replaced until June 1981. Thus, they were not operating on the night of the shooting. The bulbs were removed, he said, as part of a test to determine whether there was enough light at the intersection without the two street lamps.

On rebuttal, the State, in an effort to refute defendant's claim that the gun discharged accidentally, called Sharon Bess to the stand. Bess testified that she lives on the second floor of the Bess Hotel, which is located at the intersection of State and Madison. Bess said she went to bed about 9 p.m. on December 30, 1980, and was awakened during the night by loud talking, which was coming from the street below. She then heard someone yell "Please." A couple of seconds later she heard what she thought was a gunshot. Bess testified that she ran to her window and saw a man falling to the ground and another man running away.

■ Defendant first contends he was unlawfully arrested and therefore his statements to the police as well as Blank's revolver should have been suppressed as fruit of an illegal arrest and detention. Defendant essentially concedes that Officer Hanson had authority to stop and frisk him in the parking lot of the Sandwich Factory

under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, but argues that once the officer failed to find any weapons, he lacked authority to detain him further. Defendant contends that when Hanson placed him in the back seat of the squad car, the officer exceeded the scope of the *Terry* search and in effect arrested him without probable cause. In addition, defendant argues that after he had been placed in the squad car, Hanson exceeded the scope of the *Terry* stop by then peering into his automobile. Defendant maintains that because he was locked in the police car, he could not reach any weapons in his own vehicle. Accordingly, he maintains that there was no threat to Hanson's safety, and therefore Hanson lacked authority to peer into his car with a flashlight.

The State advances three theories to support the admission of the challenged evidence. First, it argues that even if Hanson's act of placing the defendant in the squad car constituted an arrest without probable cause, the evidence was properly admitted because defendant failed to show that it was the fruit of that arrest. It notes that Hanson did not stop defendant's car; rather, he merely parked along side it in the parking lot of the Sandwich Factory. Consequently, the State contends that the seizure of Blank's gun was lawful under the plain view doctrine since Hanson had a right to be in a position to have a view into defendant's automobile. Hanson's discovery of the gun was not rendered invalid, it maintains, merely because Hanson did not view the gun until defendant was already in the squad car.

Second, the State argues that Hanson had probable cause to arrest defendant. To support this theory, the State relies on Hanson's testimony at the pretrial suppression hearing.

Hanson, who was the only witness to testify at the hearing, stated he heard Blank radio that he was chasing a suspect for a possible theft of a purse, a suspect Blank described as a black male wearing a blue jacket and a blue stocking cap. As he responded to the call, Hanson said he heard another transmission in which Blank said he was down and needed assistance. Shortly thereafter, Hanson received additional information from officers who had arrived at State and Madison informing him that Blank was down, that an ambulance had been dispatched and that Blank's gun was missing. According to Hanson, approximately 1½ minutes after Blank's initial transmission, he saw a Mercury, occupied by two black males, about one block from the Stage Door Lounge. One of the occupants, he said, was wearing a dark coat and blue stocking cap. Hanson testified he followed the car for approximately two minutes and parked next to it in the parking lot of the Sandwich Factory, where he con-

fronted defendant and Hockett. The State argues that this information provided Hanson with probable cause to believe that an offense more serious than a purse theft had occurred. Moreover, it notes that Hanson knew, based upon Blank's transmission, that the suspect was being chased on foot. Given all the facts known to Hanson when he confronted defendant and Hockett in the parking lot, including the fact that defendant was out of breath and had difficulty speaking and that he had a "fleshy material" on his face, the State argues Hanson had probable cause to arrest defendant.

Third, the State argues Hanson was justified under *Terry* in placing defendant and Hockett in the squad car. This minimal detention, it asserts, was necessary to protect the officer's own safety, particularly since he knew that Blank's gun was missing.

It is not necessary in our opinion to determine whether Hanson had probable cause to arrest defendant when he placed him in the squad car, for we conclude that defendant's brief detention was permissible under *Terry*. In *Michigan v. Summers* (1981), 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587, the Supreme Court stated that "some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as the police have an articulable basis for suspecting criminal activity." (452 U.S. 692, 699, 69 L. Ed. 2d 340, 348, 101 S. Ct. 2587, 2592-93.) The court went on to note that "the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons ***." 452 U.S. 692, 700, 69 L. Ed. 2d 340, 348, 101 S. Ct. 2587, 2593.

Defendant acknowledges that the police may properly go beyond a mere stop and frisk allowed by *Terry* (see *People v. Lippert* (1982), 89 Ill. 2d 171, and the cases cited therein), but insists that they are permitted to do so only when they are "sure" that a crime has been committed. Claiming that in this case the radio transmission which Hanson heard merely stated that there was a suspicion of a purse being stolen, defendant argues that Hanson was not sure that a crime had been committed and thus lacked authority to detain him in the squad car.

We find little merit to this argument. Defendant chooses to ignore the fact that at the time Hanson actually stopped defendant and Hockett in the parking lot, Hanson knew that Blank was down, that his gun was missing and that an ambulance had been summoned.

Given all the information, Hanson could reasonably infer that a much more serious crime had occurred.

Professor LaFave in his treatise on search and seizure sets forth several investigative techniques which may be utilized in the course of a *Terry* stop, including detaining a suspect while it is determined if in fact an offense has occurred in the area. (3 W. LaFave, Search & Seizure sec. 9.2(f), at 36, 37 (1978).) This was aptly illustrated in *People v. Vena* (1984), 122 Ill. App. 3d 154. In *Vena*, the police responded to a call in which a resident in Lincolnshire stated that three "suspicious" men were walking through the backyards of the neighborhood. The caller described the men as wearing dark jackets, pants, and hats but did not say that he saw them commit any criminal offense. When police officers arrived at the scene, they followed two sets of footprints in the snow through a number of backyards and eventually came upon the two defendants, who were dressed in clothes similar to those described by the caller. When the defendants were told to "freeze," they began running. Shortly thereafter they were apprehended but refused to identify themselves. As a result, they were placed in a squad car and driven to the police station. According to the officers, when first observed, the defendants were not committing any crime. Nor were the officers aware that a crime had been committed in the area, although they were aware that a number of residential burglaries had recently been committed in the immediate locality. Approximately 20 minutes after the defendants were taken to the police station, the police received a report of an attempted burglary in the neighborhood in which the defendants were found. The defendants were then placed under arrest and searched. The search produced a number of items that had been taken during another burglary in the area. The trial court suppressed the evidence. On appeal this court reversed, holding that the officers were justified in detaining the defendants while they investigated for criminal activity. Observing that the police needed to detain the defendants in order to determine if a burglary had been committed in the area from which they had just emerged, the court concluded "that this short period of time was only minimally intrusive when compared to the benefit of immediate investigation." 122 Ill. App. 3d 154, 162.

In this case, Hanson, based on the radio transmissions, possessed specific and articulable facts which, when taken together with the rational inferences therefrom, could reasonably lead him to believe that a crime, possibly a serious one, had been committed. Considering that Hanson observed the Mercury about a block from the Stage

Door Lounge 1½ minutes after Blank's original radio transmission and that one of the occupants matched the description of the suspect being chased by Blank, we conclude that when Hanson confronted the defendant and Hockett in the parking lot he was justified in detaining them for a reasonable period of time in order to determine whether a crime in fact had been committed and whether either defendant or Hockett was involved. Moreover, it is significant to note that the intrusion involved here was extremely limited. Defendant, unlike the defendants in *Vena*, was not transported to another location; rather, defendant's detention lasted only as long as it took Hanson to walk to defendant's automobile, shine his flashlight in the window and observe Blank's revolver. At that point, the officer, recognizing Blank's weapon, clearly had probable cause to arrest defendant, a fact which defendant does not dispute. As in *People v. Vena* (1984), 122 Ill. App. 3d 154, 162, the short period of time that defendant was detained "was only minimally intrusive when compared to the benefit of immediate investigation." Accordingly, we find no error in the trial court's refusal to suppress Blank's revolver or defendant's statements to the police.

■ Defendant, asserting that he "was convicted by a voice from the grave," next contends that his rights under the sixth amendment were violated by the admission of certain statements made just before Blank was shot. First, he maintains it was improper to admit evidence of the radio transmission made by Blank as he was chasing defendant. The trial court, although finding that Blank's statements were hearsay, admitted the evidence under the excited-utterance exception. Defendant argues that there was no occurrence startling enough to bring Blank's statements within the exception. He insists the most that occurred was that a coat-check attendant told Blank to check under defendant's coat, after which defendant fled with Blank in pursuit. Such an occurrence, defendant argues, is not a startling event but rather "is a common occurrence in the life of a police officer."

In order for a hearsay statement to be admissible under the excited-utterance or spontaneous-declaration exception, there must be an occurrence or event sufficiently startling to cause a spontaneous and unreflecting statement, an absence of time to fabricate, and a relationship between the statement and the occurrence or event. (*People v. Poland* (1961), 22 Ill. 2d 175, 181.) "The exception is premised on the notion that the excitement caused by the event or condition temporarily stills the capacity for reflection, thus producing statements free of conscious fabrication." (E. Cleary & M. Graham, Illi-

nois Evidence sec. 803.3 (4th ed. 1984).) In determining whether a statement qualifies as an excited utterance, all the circumstances surrounding the making of the statement must be considered. *People v. Grover* (1983), 116 Ill. App. 3d 116, 119.

■ In the present case, Blank, while standing outside the Stage Door Lounge, was told by the coat-room attendant to check under defendant's coat for a purse that was believed to have been stolen. At that point, defendant suddenly began running down an alley. Blank not only immediately gave chase but started transmitting his location and a description of the subject. As Blank kept the dispatcher apprised of his route, he pursued defendant through a number of alleys, finally catching up with him at the corner of State and Madison where the two struggled for possession of the officer's gun. Considering all the circumstances, we believe Blank's pursuit of defendant constituted a sufficiently startling event so as to bring the officer's statements within the purview of the excited-utterance exception. In this regard we note that there certainly was no opportunity for Blank to reflect on or fabricate his statements, a fact which the supreme court has said is the controlling factor in determining whether a statement can properly be characterized as an excited utterance. (*People v. Poland* (1961), 22 Ill. 2d. 175, 181.) Thus, we find that Blank's statements over his radio were properly admitted.

■ ■ Defendant also complains that the trial court erred in permitting Sharon Bess to testify that she heard someone yell "Please" seconds before she heard a gunshot. Defendants contends that Bess' testimony was hearsay and does not fall within any exception to the hearsay rule. Defendant, however, did not raise this issue in his written motion for new trial, and therefore the issue is not properly before this court. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282.) In any event, it is evident that Bess' testimony was properly admitted. The error in defendant's position is that the testimony by Bess describing how she heard someone shout "Please" is not hearsay since it was not offered to prove the truth of the matter asserted. (See *People v. Stewart* (1984), 105 Ill. 2d 22, 57-58.) Indeed, as the State points out, there was no truth to be proven with regard to the word "Please." The statement was offered merely to show that the exclamation was made. Bess' testimony was certainly relevant in that it tended to refute defendant's allegation that the gun accidentally discharged when he and Blank fell to the ground. Bess stated that "a couple of seconds" elapsed between the time she heard someone yell "Please" and the time she heard the gunshot. Inasmuch as the challenged testimony was not hearsay, we conclude that it was properly admitted.

Defendant next alleges that the trial court should have granted his motion for a change of venue due to "massive pretrial publicity." He notes that of the 150 potential jurors questioned in this case, 82% had either read or heard about this particular offense. The record reveals that 24 jurors were excused for cause because they had formed an opinion as to defendant's guilt. Defendant also notes that of the jurors chosen to hear the case, two-thirds had either read or heard about the case from the media. At a hearing on his motion, defendant called Professor Pierre DeVise of the University of Illinois as an expert witness. DeVise had written a number of articles, including one dealing with the impact of the news media on the attitudes of people with respect to crime and murder, especially interracial murder. According to DeVise, after reviewing the numerous newspaper articles concerning the present case, he was of the opinion that the news accounts were prejudicial and that defendant could not receive a fair trial in Winnebago County.

Whether to grant or deny a motion for a change of place of trial rests within the sound discretion of the trial court. (*People v. Black* (1972), 52 Ill. 2d 544, 557; *People v. Farris* (1980), 82 Ill. App. 3d 147, 152.) In reviewing a trial court's denial of a change of place of trial, the controlling factor is " 'whether upon the record as a whole the defendants received a [fair] trial before a fair and impartial jury.' " (*People v. Taylor* (1984), 101 Ill. 2d 377, 397, quoting *People v. Yonder* (1969), 44 Ill. 2d 376, 388.) A juror need not be totally ignorant of the facts or issues in the case. (*People v. Taylor* (1984), 101 Ill. 2d 377, 386; *People v. Williams* (1968), 40 Ill. 2d 522, 531.) As the United States Supreme Court stated in *Irvin v. Dowd* (1961), 366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1642-43:

> "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

All that defendant has established in this case is that the shooting of Officer Blank received a considerable amount of publicity and that 24 of the 150 prospective jurors had formed an opinion as to defendant's guilt. A review of the *voir dire*, however, reveals that all of the jurors eventually selected assured the court that they had formed no opinion on the case. Moreover, the record discloses that defendant failed to exhaust his preemptory challenges, a fact which

1056

the courts have repeatedly found to be significant in determining whether the trial court abused its discretion in denying a motion for a change of place of trial. (*People v. Black* (1972), 52 Ill. 2d 544, 557; *People v. Williams* (1968), 40 Ill. 2d 522, 531; *People v. Townes* (1985), 130 Ill. App. 3d 844, 856.) Given the record here, defendant has clearly failed to establish that the pretrial publicity deprived him of a fair and impartial trial. It therefore cannot be said that the trial court abused its discretion in denying defendant's motion for a change of venue.

■ Defendant next contends that his conviction must be reversed because of an incident involving the jury that occurred at the courthouse door. Defendant charges that the trial court should have granted his motion for a mistrial "when the jurors were threatened with death by a group of young toughs, milling about the Courthouse." The incident of which defendant complains occurred during a noon recess as the jury was being escorted to lunch by two bailiffs. Apparently due to the severity of the weather, about 20 people were on the steps just inside the courthouse door, presumably waiting for a bus. The bailiff who was leading the jurors asked a young black youth if he would move from the steps so the jury could pass through. The youth became somewhat belligerent but finally acceded to the bailiff's request, and the jurors walked outside. A second youth, about 16 or 17 years of age, followed the jury out of the building and exchanged words with Ernie Seaton, the bailiff who was at the rear of the jury. According to Seaton, the youth accused the bailiffs of picking on his friend. Seaton informed the youth that the group was a jury and that he, Seaton, did not want anyone talking to them. Seaton stated he began walking away and heard the youth yell out "that if he had a gun, he would kill all of us." The jury then proceeded to a nearby restaurant without any further occurrence. Defendant maintains that this incident deprived him of his right to a fair and impartial jury, thereby entitling him to a new trial.

Whether to grant or deny a motion for a mistrial rests within the sound discretion of the trial court, and its decision will not be overturned on review absent an abuse of that discretion. (*People v. Malmenato* (1958), 14 Ill. 2d 52, 63; *People v. Dolgin* (1953), 415 Ill. 434, 445-46; *People v. Campbell* (1984), 126 Ill. App. 3d 1028, 1036.) "To warrant a reversal, it must reasonably appear that the jurors, or at least some of them, have been influenced or prejudiced to the extent that they cannot be fair and impartial." (*People v. Malmenato* (1958), 14 Ill. 2d 52, 65.) In making this determination, all the facts and circumstances surrounding the jury's exposure to the alleged

prejudicial matter must be considered. *People v. Hryciuk* (1954), 5 Ill. 2d 176, 183-84; *People v. Rogers* (1985), 135 Ill. App. 3d 608, 626.

In this case, the trial court upon learning of the incident questioned the jurors individually regarding whether they had heard the threat and what impact, if any, it might have on their ability to remain impartial. The trial court also allowed both the prosecution and defense to submit questions that they wished the court to put forth to each juror. The record discloses that a number of jurors, apparently due to their location at the time of the occurrence, were totally unaware that anything unusual had taken place, while others recounted that they were not sure what they had heard. Although a number of jurors told the court that they were initially concerned and upset over the incident, each said they no longer harbored such feelings. Further, each juror stated unequivocally that they did not associate the incident in any way with defendant and that they could remain fair and impartial. Some even expressed surprise over being questioned, saying they had totally forgotten what had occurred. While the verbal assurances of the jurors that they could disregard the incident and decide the case solely on the evidence presented are not to be deemed conclusive (*People v. Taylor* (1984), 101 Ill. 2d 377, 391; *People v. Rogers* (1985), 135 Ill. App. 3d 608, 625-26), they nevertheless are an important consideration (*People v. Taylor* (1984), 101 Ill. 2d 377, 398; *People v. Cole* (1973), 54 Ill. 2d 401, 414) and taken together with the circumstances surrounding the threat convince us that defendant was not deprived of a fair and impartial jury. There is no evidence which even remotely suggests that the threat was intended to affect the outcome of the case or that the two youths involved were even aware that the jurors were sitting on this particular case. Rather, the episode appears to have involved, to quote the words of one juror, "just kids fooling around." Similar views were expressed by other jurors.

Defendant argues a mistrial should have been declared because the threat "may have" affected the impartiality of the jurors. However, in *People v. Cole* (1973), 54 Ill. 2d 401, a case in which one of the jurors knew the prosecutor and other individuals connected with the case, the supreme court made clear that the mere suspicion of bias is not sufficient to disqualify a juror. (54 Ill. 2d 401, 415; see also *People v. Collins* (1985), 106 Ill. 2d 237, 274.) Although the incident involved here was indeed unfortunate, there is simply no evidence to indicate that the threat had any impact whatsoever on the jurors' ability to render a fair and impartial verdict. Accordingly, the trial court did not abuse its discretion in denying defendant's motion

for a mistrial.

The last issue to be addressed concerns defendant's claim that his sentence is excessive. He contends that a sentence of imprisonment for the rest of his natural life cannot be justified given (1) the lack of premeditation; (2) the nonviolent nature of his prior record; and (3) the excellent prospects for his rehabilitation.

Defendant points out that article I, section 11, of the Illinois Constitution states in part: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, sec. 11; see also Ill. Rev. Stat. 1985, ch. 38, par. 1001—1—2.

Defendant argues that the natural life imprisonment penalty, being a unique penalty, should be applied only for the most heinous crimes involving wanton cruelty. This argument is clearly in conflict with the Unified Code of Corrections which provides that the trial court may impose a sentence of natural life imprisonment for murder if the murdered individual was a policeman and the murderer knew or should have known that fact. (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—1(a)(1)(b), 1005—9—1(b)(1).) See also *People v. Hudson* (1981), 95 Ill. App. 3d 350, and cases cited therein.

Next, the defendant argues that the murder he stands convicted of was not a premeditated murder such as occurred in the case of *People v. La Pointe* (1981), 88 Ill. 2d 482. He likens it to the spontaneous melee type of homicide found in the facts of the case of *People v. Viser* (1975), 62 Ill. 2d 568. Suffice to say the trial judge in his summation indicated that the defendant acted deliberately in the shooting of Officer Blank. We believe that determination is supported by the evidence.

The defendant argues that the trial judge sentenced the defendant only based on the seriousness of the offense and he was in error in failing to take into account the defendant's possibility for rehabilitation. The defendant argues that the evidence shows that his character and attitudes indicate that he is unlikely to commit another crime. The defense submits that the defendant has a nonviolent history and has experienced a Christian conversion so that he meets the criteria for minimizing a sentence of imprisonment and thus should not be subjected to natural life imprisonment.

In mitigation, defendant offered the testimony of four clergymen who stated that defendant had become a Christian; that he regularly participated in Bible study classes held at the jail and was involved in a Bible correspondence course; that they had observed the change in defendant's life; that defendant had expressed deep remorse over

shooting Blank and wanted to atone for the loss of the officer's life; that defendant had expressed a strong desire to work with young people upon his release; and that defendant definitely could be rehabilitated. As to the latter, two of the witnesses stated that not only could defendant be restored to a decent and useful citizen, but society would best be served by giving him the opportunity to share his experiences with others.

Testifying in his own behalf, defendant told the court that he accepted responsibility and culpability for the loss of Blank's life. Saying "I am very, very sorry," defendant indicated that he would like to speak to Blank's family to express his "deepest sincere regrets for what happened." Defendant also told the court of his desire to serve his sentence and then work with young people "to explain to them that the life of crime is not the life that anyone should lead."

With respect to the foregoing evidence, the trial court characterized defendant's criminal record as "not so bad." The court also stated that it believed all of the witnesses testifying in defendant's behalf, and that it found defendant to be truly remorseful over Blank's death.

The evidence presented by the State in aggravation—apart from the circumstances surrounding the shooting of Officer Blank—consisted of defendant's prior criminal history. The record discloses that in 1968 defendant was charged with petty theft for stealing four tires from an automobile dealer. Defendant pleaded guilty to that offense and was fined $100. In 1975, defendant was again charged with petty theft after he stole a 75-cent package of hot dogs from a grocery store. After pleading guilty, defendant was fined $50. In 1976, defendant pleaded guilty and was sentenced to two years' probation for burglarizing a gas station, during which he stole a case of motor oil.

The presentence report indicated defendant, now age 36, dropped out of high school but later obtained a general education development certificate. He served in the United States Army. He was married and divorced and lived with another woman by whom he has a child.

Defendant indicated that he drank beer every weekend and smoked marijuana weekly. Defendant's employment history was spotty with no long periods of gainful employment.

The defendant argues that the trial court failed to take into account the defendant's rehabilitative potential and thus, violated the constitutional mandate which provides: "All penalties shall be determined both according to the seriousness of the offense and with the

objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, sec. 11.) However, it has been held that this provision does not require the judge to detail for the record the process by which he concluded the penalty he imposed was appropriate. *People v. La Pointe* (1981), 88 Ill. 2d 482.

From the evidence we have reviewed we can see that the trial judge would not have been in error in failing to see any rehabilitative potential in the defendant and thus was not in error in the sentence he imposed.

The imposition of punishment is one of the most important and sensitive of judicial responsibilities, and it is well recognized that a court of review must give great weight to the decision of the trial court. (*People v. Godinez* (1982), 91 Ill. 2d 47, 55.) That court had the first responsibility of determining a proper sentence and of imposing it. The trial judge is charged with a difficult task of fashioning a sentence which would strike the appropriate balance between protection of society and rehabilitation of the offender. (*People v. Cox* (1980), 82 Ill. 2d 268, 280.) It is well accepted that a court of review should not substitute its judgment or preference for that of the trial court, which is ordinarily best situated to tailor a sentence or other disposition to the needs of the case. (*People v. Steppan* (1985), 105 Ill. 2d 310.) The trial court is best suited to tailor a sentence to the needs of the case. It balances the appropriate factors in imposing sentence, and the exercise of this discretion should not be altered upon review absent abuse of that discretion. *People v. Hicks* (1984), 101 Ill. 2d 366, 375; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154.

The record indicates that the trial court in this case carefully considered the evidence within the prescribed statutory framework, including the statutory factors in mitigation and aggravation, the presentence investigation, the credibility and demeanor of the witnesses, the defendant's deliberate acts and the showing of remorse on his behalf.

The record indicates a thorough consideration of the factors constitutionally and statutorily designated for the trial judge's attention.

We cannot say the sentence of natural life imprisonment imposed on Ollie Staten, Jr., was an abuse of the court's discretion.

The judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

SCHNAKE and STROUSE, JJ., concur.