THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* ALBERT VENA *et al.*, Defendants-Appellees.

Second District   Nos. 81—737, 81—738 cons.

Opinion filed February 29, 1984.—Rehearing denied March 28, 1984.

NASH, J., dissenting.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

William M. Doty, Jr., of Russo, Doty & Associates, and Robert DeMeo, both of Chicago, for appellees.

JUSTICE LINDBERG delivered the opinion of the court:

The State appeals (87 Ill. 2d R. 604(a)(1)) from an order of the circuit court of Lake County which granted the post-trial motion of defendant, Albert Vena, to quash his arrest and suppress the evidence seized from his person subsequent to the arrest. The State's sole contention on appeal is that the trial court incorrectly granted the motion to quash and suppress because the arrest was based upon probable cause.

Albert Vena was charged by information with attempted burglary, burglary, and theft over $150. After a jury trial he was convicted of felony theft (Ill. Rev. Stat. 1981, ch. 38, par. 16—1(a)(1)) and found not guilty of burglary. Mario Rainone, a codefendant who was tried separately, was charged by information with attempted burglary.

Each defendant filed a pretrial motion to quash his arrest and suppress evidence seized subsequent to the arrest. After holding an evidentiary hearing the trial court denied the motion. Defendants filed a motion for reconsideration of the denial of their motions to quash and suppress; the court below denied the motion to reconsider. Vena filed another motion to suppress. Subsequent to holding a hearing at which additional evidence in support of the motion was presented, the court again denied the motion to suppress. Thereafter the court granted Vena's motion to sever his trial from that of the codefendant.

During Vena's trial and prior to presenting defendant's case, defense counsel renewed his motion to suppress evidence; the trial court denied the motion. The jury found Vena guilty of theft over $150 and not guilty of burglary. Subsequently, the court entered a judgment of conviction on the theft verdict. Thereafter, Vena again filed motions to quash his arrest and to suppress evidence as well as a post-trial motion for a new trial, which was based on the ground, among others, that the trial court erred in refusing to grant his prior motions to quash his arrest and to suppress the evidence seized as a result of the arrest.

After hearing argument on the matter, the court reversed its earlier ruling and determined that the evidence which the police seized from Vena was the result of an arrest that was not based on probable cause or reasonable grounds. Accordingly, the court below suppressed the evidence which was seized from Vena, vacated the judgment of conviction and the jury's verdict, and granted Vena's request for a new trial. Pursuant to the State's request, the trial court extended its

ruling affecting the admissibility of evidence in Vena's case to the case of the codefendant Rainone as well.

The State filed a motion for reconsideration, which the trial court denied. Thereafter, the State filed a timely notice of appeal in both cases, which have been consolidated for purposes of this appeal. The State also filed in the trial court the requisite certificate of impairment relative to each defendant. See *People v. Young* (1980), 82 Ill. 2d 234.

The incident in question took place on February 10, 1981, in the village of Lincolnshire. At approximately 3:13 p.m. on that day, Officer Born responded to a call from the Dedrich home that three "suspicious" men were walking through the backyard at 39 Canterbury Drive. Mr. Dedrich did not tell the officer that he observed the three individuals committing any criminal offense. Dedrich briefly described the men as persons who were wearing dark jackets, pants and hats; Born related that brief description over his police radio to other squad cars.

The weather that day consisted of very heavy snow and blizzard-like conditions; six to eight inches of snow were on the ground. Officer Born followed two sets of footprints from the Dedrich's backyard leading to, then crossing, Queen's Way. He followed the unbroken footprints for one-half hour and for a distance of approximately a mile and one-half to two miles. The footprints led across Queens Way Road and to a location called Dawson Farm, where the officers saw the two defendants. There was no break in the footprints from the time Born commenced following them until he found Vena and Rainone.

Born stated that the clothing defendants were wearing was similar to that which Mr. Dedrich had described to him. According to Born, at the time he observed defendants they were not violating the law, and he had no reason to arrest them. When Born, who was in uniform, saw defendants, he announced that he was a police officer and told them to "freeze." At that moment, defendants turned around, looked at him, stopped climbing a fence, came down and started running. Born began to pursue them and radioed for assistance. The officer chased the two individuals, and with the help of Officer Bracatto, Born apprehended Vena. In effecting the apprehension, Bracatto's mouth was injured. Both officers had their weapons drawn at the time they apprehended Vena; Officer Born then placed handcuffs on Vena. Born stated on two separate occasions during his testimony that he placed Vena under arrest at this time, although he later testified that he never advised Vena that he was under arrest when Vena was taken into custody at Dawson Farm. Born also assisted

with the arrest of Rainone. At that time, neither subject was charged with a crime because Born was not then aware that any crimes had been committed in the area.

Officer Tavernier, who helped Officer Born follow the footprints, testified as follows:

"Q. Officer, did you have reason to believe there had been a crime committed in the area?

A. Yes, sir, I did.

Q. What was that belief based upon?

* * *

A. We had been experiencing numerous burglaries in the area of Wood Creek Courts. We received a telephone call from a concerned citizen reporting three male subjects, adult male subjects, in their backyard.

Q. Officer, that was Mrs. Dedrich, is that correct?

A. Mrs. Dedrich made the initial call to our department.

Q. Subsequent to that call, within the next half-hour, had your department received another phone call?

A. Yes, shortly thereafter we received a second phone call.

Q. Do you know who that phone call was from?

A. From a lady. I don't know the name. Who was taking care of a house at 6 Tidewater. A citizen called and reported also there were men in the backyard of 6 Tidewater.

Q. Proceed. Tell us what your belief is based upon.

A. Like I say, the area on Tidewater we had at least two burglaries on Tidewater.

MR. STAVROS: Objection.

THE COURT: Wait. When?

THE WITNESS: The previous week."

When Tavernier observed defendants at Dawson Farm, they were not committing a crime, and he was not aware that a crime had been committed in the area at the time defendants were stopped. According to the witness, the police stopped defendants because of the two complaints regarding suspicious persons in the residential area and in order to investigate their identity. Defendants were taken into custody because they ran from the police, failed to stop, and refused to identify themselves.

Tavernier apprehended Rainone and placed him in custody, and Officer Andrews advised Rainone of his *Miranda* rights. When Officer Tavernier asked Rainone who he was and what he was doing there, defendant did not respond to the inquiries other than to comment that he knew the officer had a job to do. The officer then con-

ducted a pat-down search of Rainone and found nothing. Officer Roulo assisted two other policemen place Rainone in the rear seat of Roulo's squad car; he also helped take Vena, who was handcuffed, into custody. Prior to putting Vena into the squad car, Roulo conducted a pat-down search of the subjects and felt two large objects in Vena's back pocket. The items were a yellow plastic flashlight and a large folding knife. Then officers Roulo and Tavernier transported defendants to the Lincolnshire police department.

Approximately 15 to 20 minutes after Vena had been placed in custody and taken to the police station, Corporal Richter radioed a report to the station regarding an attempted burglary at 3 Queens Way in Lincolnshire. After hearing that report, Officer Roulo then searched Vena at the police station and removed additional items from Vena's person, including a large set of keys, a wallet containing identification and miscellaneous papers, yellow metal cufflinks, a yellow-colored toothpick in a leather sheath and an earring.

The police department received a report of a burglary at 1810 Saunders Road in Riverwoods, which adjoins Lincolnshire and is patroled under contract by the Lincolnshire police department, at least one day after defendants were taken into custody. Several days later the victim of the Riverwoods burglary identified items found in the search of defendant Vena as property taken in the burglary. Defendant Vena's conviction of theft of property exceeding $150 in value was based upon the Riverwoods burglary and theft.

The State advances a two-fold argument on appeal in support of its position that the trial court improperly granted the motion to quash and suppress. The State contends first that the police were justified in conducting an investigatory stop and pat-down search (Ill. Rev. Stat. 1979, ch. 38, pars. 107—14, 108—1.01) of defendants at the Dawson Farm. Continuing, the State maintains that, once defendants fled at the approach of the police and refused to identify themselves upon being apprehended and after police discovered a flashlight and a long knife on the person of Vena, the officers had probable cause to arrest defendants.

In the alternative, the State asserts that, even if probable cause to arrest was lacking at the Dawson Farm, the officers nonetheless were justified, under the Illinois temporary detention statute (Ill. Rev. Stat. 1979, ch. 38, par. 107—14), in transporting defendants to the police station, to ascertain their identities after they had earlier refused to identify themselves and explain their activities. According to the State shortly after defendants were taken to the police station, probable cause to arrest them arose when the police were informed that an

attempted burglary had occurred in the vicinity where defendants had been walking.

Defendants argue that the police did not have (1) the authority under the temporary detention statute to stop them or (2) probable cause to arrest them at the farm. Moreover, defendants remonstrate that law enforcement officials acted beyond the reasonable scope of an investigatory stop when they transported defendants to the police station and detained them there. Consequently, according to defendants, any arrest at the police station based on probable cause that developed after they were conveyed to the stationhouse was invalid.

■■ The principles governing the employment of an investigatory stop are well-settled. A police officer, in appropriate circumstances and in an appropriate manner may approach an individual for purposes of investigating possible criminal behavior even though there is no probable cause to arrest, provided however, that the officer's decision to stop is based on specific and articulable facts which, when combined with rational inferences from those facts, reasonably warrant the investigative intrusion. (*Terry v. Ohio* (1968), 392 U.S. 1, 20-21, 20 L. Ed. 2d 889, 905-06, 88 S. Ct. 1868, 1879-80; *People v. Beil* (1982), 110 Ill. App. 3d 291, 293, 442 N.E.2d 291, 292-93; *People v. Tribett* (1981), 98 Ill. App. 3d 663, 671, 424 N.E.2d 688, 694; *People v. Grice* (1980), 87 Ill. App. 3d 718, 722, 410 N.E.2d 209, 214, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714; *People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 694-95, 402 N.E.2d 915, 921, *cert. denied* (1981), 450 U.S. 915, 67 L. Ed. 2d 340, 101 S. Ct. 1357.) In determining whether a stop is reasonable, an objective standard is to be used, namely, whether the facts available to the officer warrant a person of reasonable caution to believe that the action taken was appropriate. (*Terry v. Ohio* (1968), 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880; *People v. Holdman* (1978), 73 Ill. 2d 213, 221, *cert. denied* (1979), 440 U.S. 938, 59 L. Ed. 2d 496, 99 S. Ct. 1285; *People v. Tribett* (1981), 98 Ill. App. 3d 663, 671, 424 N.E.2d 688, 694; *People v. Grice* (1980), 87 Ill. App. 3d 718, 723, 410 N.E.2d 209, 214.) A mere suspicion or hunch, however, is not sufficient. (*People v. Tribett* (1981), 98 Ill. App. 3d 663, 671, 424 N.E.2d 688, 694; *People v. Grice* (1980), 87 Ill. App. 3d 718, 723, 410 N.E.2d 209, 214.) Because there are no conclusive rules for determining whether an investigatory stop is justified, each case must be adjudicated on its particular facts. *People v. Mills* (1983), 115 Ill. App. 3d 809, 812, 450 N.E.2d 935, 937; *People v. DeLisle* (1982), 104 Ill. App. 3d 297, 299, 432 N.E.2d 954, 956.

Sections 107—14 and 108—1.01 of the Code of Criminal Procedure

of 1963 (Ill. Rev. Stat. 1979, ch. 38, pars. 107—14, 108—1.01) have codified the *Terry* rules regarding the permissible use of an investigatory stop and attendant frisk for the presence of weapons. (*People v. McGowan* (1977), 69 Ill. 2d 73; *People v. Ellis* (1983), 113 Ill. App. 3d 314, 317, 446 N.E.2d 1282, 1284; *People v. Pritchett* (1979), 75 Ill. App. 3d 127, 129-30, 393 N.E.2d 1157, 1160.) The Illinois codification controlling the use of an investigatory stop (Ill. Rev. Stat. 1979, ch. 38, par. 107—14) provides that a police officer, after having identified himself as such, may lawfully stop any person in a public place for a reasonable period of time when he reasonably infers from all the circumstances that the individual is about to commit or has committed an offense. (*People v. Grice* (1980), 87 Ill. App. 3d 718, 723, 410 N.E.2d 209, 214, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714.) In addition, under section 108—1.01, an officer conducting an investigatory stop may search the person for weapons if the policeman reasonably suspects he is in danger of attack. Accord, *Terry v. Ohio* (1968), 392 U.S. 1, 30-31, 20 L. Ed. 2d 889, 911, 88 S. Ct. 1868, 1884-85.

■ In the case now before the court, at the time the police officers saw defendants at Dawson Farm, the officers had just received information from two independent sources that suspicious persons had been seen walking through the backyards of a residential area during a time when six to eight inches of snow covered the ground. The officers also were aware that a number of residential burglaries had recently been committed in that immediate locality. The footprints in the snow led from the Dedrich residence across Queens Way to the place where defendants were observed. We conclude the officers had knowledge of sufficient specific and articulable facts to justify the stop of defendants in order to maintain the status quo while they investigated for criminal activity and identification. (See, *e.g., People v. McGowan* (1977), 69 Ill. 2d 73, 78-79; *People v. Ellis* (1983), 113 Ill. App. 3d 314, 318, 446 N.E.2d 1282, 1285; *People v. Tribett* (1981), 98 Ill. App. 3d 663, 672, 424 N.E.2d 688, 694.) Similarly, the officers were justified, under *Terry v. Ohio* and its Illinois statutory counterpart, in searching defendants for the presence of weapons in view of their flight and Vena's physical resistance. See *People v. McGowan* (1977), 69 Ill. 2d 73, 79; *People v. Pritchett* (1979), 75 Ill. App. 3d 127, 130, 393 N.E.2d 1157, 1160; 3 W. LaFave, Search & Seizure sec. 9.4(a), at 116 (1978).

■ In his treatise on the fourth amendment, Professor LaFave lists several investigative techniques which may be utilized in the court of a *Terry*-type stop: interrogation, including a request for iden-

tification and inquiry concerning the suspicious conduct of the person detained; communication with others in an effort to verify the explanation tendered, to confirm the identification or determine whether a person of that identity is otherwise wanted; detention of the subject while a determination is made whether an offense actually occurred in the area; and the viewing of the subject by witnesses to a crime in the area. None of the investigative methods listed above is inherently objectionable, although they might cast doubt upon the reasonableness of the detention if their use unduly prolongs the period of detention or involves moving the suspect to another locale. 3 W. LaFave, Search & Seizure sec. 9.2(f), at 36-37 (1978); accord, *Michigan v. Summers* (1981), 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587; *People v. Ellis* (1983), 113 Ill. App. 3d 314, 319, 446 N.E.2d 1282, 1285-86.

We can infer from the record that the police needed to detain defendants to determine if a more immediate crime had been committed in the area from which defendants had just emerged. Certainly defendants' attempted flight upon seeing uniformed police is sufficiently suggestive of a consciousness of guilt on the part of defendants to warrant a brief detention to determine if a more immediate crime has been committed. See *Peters v. New York* (1968), 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889.

The record suggests that not more than a brief detention would be required to determine whether a more immediate crime had been committed. We conclude that this short period of time was only minimally intrusive when compared to the benefit of immediate investigation. See *People v. Lippert* (1982), 89 Ill. 2d 171, 183, *cert. denied* (1982), 459 U.S. 841, 74 L. Ed. 2d 85, 103 S. Ct. 92.

Nor do we believe such a detention was unreasonably intrusive where the defendants were placed in a squad car. Their freedom was completely restrained whether they were inside or outside of the squad car. The defendants fail to suggest any intrusive purpose of the police in placing defendants in the squad car. No effort was made to interrogate or identify defendants or impose any intrusive investigation upon them. Nor does it appear that any public stigma attached to their being placed in the squad car as there was no evidence that the scene was viewed by the public. See *People v. Bloyd* (1982), 416 Mich. 538, 331 N.W.2d 447.

Further, our supreme court has sanctioned the limited transportation of a suspect for an immediate crime-scene showup, thereby rejecting the argument that such a procedure was prohibited under *Terry v. Ohio* and its Illinois statutory counterpart. (*People v. Lippert* (1982), 89 Ill. 2d 171, 178, *cert. denied* (1982), 459 U.S. 841, 74 L.

Ed. 2d 85, 103 S. Ct. 92; accord, *People v. Kincy* (1982), 106 Ill. App. 3d 250, 256, 435 N.E.2d 831, 835-36; see *People v. Canity* (1981), 100 Ill. App. 3d 135, 149-50, 426 N.E.2d 591, 602.) Similarly, a warrant check pursuant to a *Terry* stop does not convert the stop into a full-fledged arrest. *People v. Ellis* (1983), 113 Ill. App. 3d 314, 320, 446 N.E.2d 1282, 1286.

Unquestionably the police conduct in transporting the suspect to the crime scene in *Lippert* was supported in part by the fact the armed robberies of the two elderly couples had just occurred. In the case at bar the crimes partially forming the basis of the investigative detention and transportation of defendants were two burglaries occurring during the previous week. Nonetheless, the conduct of defendants in traversing the same area where the burglaries occurred, in attempting to flee the uniformed police and in refusing to identify themselves justified the investigation of whether an offense had just occurred. See 3 W. LaFave, Search & Seizure sec. 9.2(f), at 36-37 (1978).

Further, *Lippert* involved substantially more intrusive albeit entirely reasonable conduct by the officer in detaining the suspect and transporting him for both questioning and viewing by the victims at the scene of the armed robberies. Neither the record here nor defendants on appeal speak of any intrusive police conduct during their detention in the squad car and police station.

We do not view the removal of defendants to the police station as more intrusive *per se* than detaining them in the open field or in the squad car. In fact both the squad car and the stationhouse protected the defendants and police officers from the blizzard-like weather conditions. It does not appear that transportation of defendants to the stationhouse was for interrogation or any other intrusive actions beyond awaiting completion of the investigation of the area just traversed by defendants.

■ Professor LaFave has commented:

"Another issue which has arisen is whether an otherwise legitimate *Terry*-type stop may involve transportation of the suspect to the police station. As a general proposition, it would seem that a negative answer is called for, as in *Terry* the Court approved the intrusions made there by noting that they did not involve an actual arrest, which 'is inevitably accompanied by future interference with the individual's freedom of movement.' Certainly when a taking to the station is accompanied by 'burdens substantially like those of arrest,' such as 'fingerprinting, photographing and completion of a lengthy arrest form,' such

procedures should not be upheld absent a showing of grounds for arrest. [*United States v. Jennings* (9th Cir. 1972), 468 F.2d 111.] It cannot be said, however, that transportation of a detainee to the station is never permissible, for in extraordinary circumstances that may be the safest course of action. An excellent illustration is provided by *People v. Courtney* [(1970), 11 Cal. App. 3d 1185, 90 Cal. Rptr. 370], where, after an angry crowd gathered at the scene where officers had stopped a suspect, the police decided to transfer the suspect to the station. The court concluded that 'there was no Fourth Amendment compulsion on the police to choose between an on-the-spot continuation of their investigation at the probable cost of their own safety, *or* abandoning the investigation.' [Quoted with approval in *People v. Harris* (1975), 15 Cal. 3d 384, 540 P.2d 632, 124 Cal. Rptr. 536.]" 3 W. LaFave, Search & Seizure sec. 9.2, at 45 (1978).

"It may also be asked whether, at least absent such extraordinary circumstances, *Dunaway* [*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248] means that taking the suspect to any police facility, no matter how close, itself transforms a *Terry* stop into an arrest. In *Florida v. Royer* [(1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319], the suspect was transported a mere 40 feet to an airport police office, which the plurality concluded transformed the situation into one of arrest for which probable cause was lacking, thus invalidating the suspect's consent to search of his luggage. Some of the reasons given for this result by the *Royer* plurality are not in all respects convincing, which makes more plausible the assumption that *Dunaway* had considerable impact on the outcome. But the notion seems to be *not* that every entry onto police 'turf' makes any seizure into an arrest, but rather that the circumstances of one's presence there may be sufficiently coercive that no distinction can rightly be drawn between that seizure and an arrest." 3 W. LaFave, Search & Seizure sec. 9.2, at 21-22 (1984 Supp.).

As noted earlier the elapsed time from the original sighting of defendants on the private property of the Lincolnshire residents to their ultimate arrest and search incident to arrest upon the detection of the attempted burglary of 3 Queens Way was less than one hour. This demonstrates exceptionally efficient police work. It also emphasizes that the intrusion upon the freedom of defendants based upon reasonable suspicion prior to the establishment of probable cause for

their arrest was only 15 or 20 minutes. Under these exceptional circumstances we do not feel there was an unreasonable intrusion sufficient to trigger the proscriptions of *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. The arrest and search of defendants in the stationhouse was pursuant to probable cause based upon the detection by Officer Richter at 4 p.m. of the attempted burglary. Consequently it was error to suppress the items seized in both the initial *Terry* search and the subsequent stationhouse search incident to a legal arrest.

In concluding we note that the State did not develop nor argue the facts in the trial court regarding Vena's physical resistance to police restraint by his striking Officer Bracato in the mouth. Further, the State did not argue below the theory that defendants' flight and Vena's resistance and obstruction of the police violated Illinois' resistance and obstruction of police statute. (Ill. Rev. Stat. 1981, ch. 38, par. 31—1; see *People v. Holdman* (1978), 73 Ill. 2d 213.) Therefore we do not consider here the significance of a violation of that statute in establishing probable cause for the arrest and search of defendants and the seizure of evidence from defendant Vena.

The judgment of the circuit court of Lake County quashing defendants' arrests and suppressing evidence seized from defendant Vena and vacating Vena's conviction are reversed. The causes are remanded for further proceedings as to both defendants Vena and Rainone.

*Reversed and remanded.*

REINHARD, J., concurs.

JUSTICE NASH, dissenting:

I respectfully dissent. While I agree with the majority that defendants were properly detained when initially seized by the officers, and could have been reasonably detained longer at that place while an investigation continued, I do not agree the requirements of the fourth amendment were met when defendants were transported to the police station and there held in custody.

The facts of this case fall between those in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, and *Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319, in both of which the court found defendants were illegally detained as the limits of a *Terry*-stop had been exceeded. While it is true limited transportation of a suspect has been sanctioned, as noted by the ma-

jority, in each case it was for a short distance to a crime scene for identification purposes by the victims. In the present case, transportation was to the police station while officers investigated whether any crime had occurred. It seems apparent defendants had been arrested when they were handcuffed, placed in the police car and taken to the station. It is equally apparent the officers then lacked probable cause to believe defendants had committed an offense.

Had the officers merely detained defendants at or near the place where they were found for a short period of time while other officers backtracked them, the scope of the intrusion would be considered reasonable under these circumstances. It was not reasonable, in my view, to arrest defendants and confine them in a police station while further investigation was undertaken. The majority appear to hold that transportation to and confinement in a police station is a generally acceptable procedure which may be carried out where the circumstances justify a *Terry* stop, and do so in a case where the only evidence that any crime had been committed by anyone related to a week earlier.

I would affirm the judgment of the trial court suppressing the evidence in this case.