FIFTH DIVISION
August 6, 2010

1-09-0792

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 21994 |
| | ) | |
| CALEB WELLS, | ) | The Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellee. | ) | Judge Presiding. |

PRESIDING JUSTICE TOOMIN delivered the opinion of the court:

This case calls on us to determine whether the circumstances of a *Terry* stop engendered sufficient reasonable suspicion of the danger of an attack to warrant a frisk for weapons. Following a hearing on defendant Caleb Wells' motion to quash arrest and suppress evidence, the trial court granted relief. The State now appeals, contending: (1) the trial court's factual findings were against the manifest weight of the evidence; (2) the stop and frisk of defendant comported with *Terry*; (3) the arresting officers had probable cause; and (4) the search of defendant's vehicle was proper. Defendant did not file a responsive brief. Consequently, we can and do consider the appeal based solely upon the State's brief and the circuit court record. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976). For the reasons that follow, we affirm the order of the circuit court.

## BACKGROUND

Defendant was charged by indictment with unlawful use of a weapon by a felon and aggravated unlawful use of a weapon by a felon. Prior to trial, counsel moved to quash defendant's arrest and suppress the evidence derived therefrom. Defendant's motion asserted the officers arrested him without probable cause. Following an evidentiary hearing on the motion, the trial court granted the motion and suppressed the evidence. In turn, the State filed a certificate of substantial impairment followed by a notice of appeal.

Officer Dervisevic was the sole witness to testify at the hearing. According to Dervisevic, at about 2 a.m. on November 7, 2008, he and his partner, Officer Mizones, responded as an assist car to a "domestic disturbance" at 1301 West Argyle in Chicago. The radio call indicated the victim, Allison Sturgill, complained to the dispatcher her ex-boyfriend was outside of her building, ringing her unit, and "threatening to kill her over the phone." Sturgill told other officers she wanted defendant to leave, but did not want to press charges. Upon arrival, Dervisevic observed defendant exiting Sturgill's apartment. Dervisevic did not speak with Sturgill at any point and was unaware of any additional conversations she had with the other officers. Likewise, the officers did not stop or speak with defendant as he left the building and proceeded on foot west on Argyle. No mention was made that defendant was possibly carrying a gun. After defendant left the area, the officers departed.

Approximately 10 minutes later, Dervisevic received a second radio call indicating defendant had returned to Sturgill's apartment; that he was "in front of the building ringing the bell and threatening to call her over the phone." Once again, there was no indication defendant

was armed. When Dervisevic and his partner returned to the area, they saw defendant walking west down Argyle at about 1325 Argyle. Defendant did not have anything in his hands. They stopped their squad car in front of him and exited to conduct a field interview. Defendant cooperated fully with the officers. However, before the officers asked defendant any questions, they "placed him in cuffs right away for our safety and [patted] him down for weapons." Officer Dervisevic discovered a handgun in defendant's left sock near his ankle. Defendant was taken into custody and transported to the 20th District police station. While at the station, defendant claimed the gun belonged to his grandmother.

Ammunition for the handgun was found in his vehicle, which was parked on the opposite side of Argyle from the encounter. Dervisevic's tow report indicated defendant's vehicle was parked at 1348 West Argyle. According to Dervisevic, defendant never gave consent to a search of his vehicle. Once in the station, after Mirandizing the defendant, the officer "asked him if he had a car [and] he stated to me that he had a car and he was parked in that block over there." Dervisevic further explained, "And to make sure that prisoner property is safe I went back there to make sure that his car is legally parked which it was not." Consequently, defendant's car was cited for parking illegally in a handicapped zone and Dervisevic called for the car to be towed. While awaiting the tow, Dervisevic searched the vehicle and found ammunition for use in the handgun found in defendant's possession.

The State argued that, based on circumstances, the officer had probable cause to conduct a *Terry* stop and pat defendant down. The State posited that the officer's actions were warranted given the close temporal proximity of the two incidents, coupled with defendant's alleged threat

to kill Sturgill, as well as the allegation that the officer was in fear. Furthermore, the officer possessed "a reasonably articulable suspicion that *** defendant was the individual who had made that threat and he certainly had probable cause to pat him down for his own safety and recover the gun."

Defense counsel countered that the officer's actions were "backwards," as defendant was immediately handcuffed and searched. Accordingly, the circumstances presented to the officers were not sufficient to establish probable cause. When the officers arrived, defendant was "walking, behaving himself." According to defense counsel, the officers needed some verification of defendant's identity and the nature of his actions giving rise to Sturgill's call to police. Consequently, the search of defendant's person was improper under the circumstances. Furthermore, the defense disagreed that this encounter could be considered a *Terry* stop or that such a stop and pat down was even warranted, especially where there was never any mention or implication of the presence of a weapon. Counsel argued the search of the car was likewise improper based upon the infirmities of the initial stop.

Following argument, the trial judge announced his findings:

"Well clearly when he is stopped which was when the officer went back and his liberty is restrained he seems to be that he is under arrest because the officers approached him for a field interview but what the officers did was they put him in handcuffs, that is a pretty strong indication of your liberty being restrained and you are not free to leave. Now no one has articulated, no officer has testified as to what he was under arrest for at that point. He is under at best he would be under arrest I

-4-

assume for a domestic disturbance. I don't know what exactly where that crime appears in the statute. As far as I know there is so [*sic*] such crime as domestic disturbance, that is a police call, that is the way that they notify the officers on the street as to the nature of something.

But the officer did not articulate that they placed the man under arrest for aggravated or simple assault or anything else they just basically took him into custody. Once they take him into custody they then search him. And but that search is incident to an arrest that is not based on the defendant actually having committed an actual crime that the officer was aware of.

So, the resulting search I believe the proceeds of that search which was done without benefit of any warrant would be and is ordered suppressed. The subsequent later search based on the defendant already being under arrest and then saying the he had a car parked out on Argyle whatever was recovered during the search of that search is the fruit of the poisonous tree from the initial illegal arrest so that will be suppressed as well."

Thereafter, the State sought reconsideration. During the argument on the motion, the State addressed an additional issue concerning the transcript of the prior hearing. Specifically, the State argued the transcript erroneously reflected that in the second radio call Officer Dervisevic received defendant "threatened to call" the victim. According to the State, the transcript should have read "threatened to kill." Additionally, the State contended the officers, in fact, had probable cause to arrest defendant for the offense of telephone harassment. Yet, even if

the officers lacked probable cause, they possessed a reasonable, articulable suspicion to stop and frisk defendant based upon the original call, the officer's response, and the second call concerning defendant's renewed actions. The State further argued that handcuffing the defendant for the officer's safety did not convert the encounter into a seizure, given that an individual, under the circumstances, could possess a weapon in light of the nature of the threats to the victim.

The trial court denied the motion to reconsider, first rejecting the State's claim that Dervisevic's testimony was erroneously transcribed. The judge explained that the answer the officer gave "resonated" with him and the transcript was consistent with his recollection and reaction to the testimony. Additionally, the trial judge discounted the officer's recorded answers on cross-examination where the questions posed referred to a threat to "kill" the victim.

The trial judge further noted that there was no testimony to indicate any mention defendant was armed when the officers approached him. Furthermore, the way the officers "rolled up on" defendant and immediately handcuffed and searched him led the court to conclude defendant was under arrest at that time. Yet, there was no indication of the basis for the arrest. Instead, not until the hearing on the motion to reconsider did the State offer the explanation that defendant was arrested or subject to arrest for telephonic harassment. In fact, the court observed:

"I don't think that the officer was taking him in custody for the telephone harassment or had any idea that maybe – he had no facts to base that on that it was harassment. He didn't know any words that were used or whatever but in any event it seemed like it was an arrest."

In the court's view, while the officer could have engaged defendant in a conversation as a part of a field interview, which defendant could have equally refused, that was not what occurred. Instead, the officer's actions in patting defendant down, even if it was for the officer's safety, was not proper without "some articulable facts or reasonable fear that this person might in fact have a weapon and be in danger." Even if these conditions existed, the officer did not articulate them. In conclusion, the court stated:

>"And quite frankly since never was there ever any mention of a weapon, not even in my finding of facts, not even a threat to kill, based on his direct examination, I don't believe the officer was justified in having an inquiry, in just turning an investigation on the street into something that become a search so the motion to reconsider is respectfully denied."

The State then filed a certificate of substantial impairment and a notice of appeal. This appeal followed. As noted, defendant did not appear or otherwise participate in this appeal.

ANALYSIS

It is axiomatic that rulings on motions to suppress are reviewed pursuant to the two-part standard articulated in *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996), where findings of historical fact are viewed for clear error with reviewing courts affording due weight to any inferences drawn therefrom by the trial court and the ultimate legal ruling concerning suppression is reviewed *de novo*. Factual findings are given great deference and are not subject to reversal unless they are contrary to the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542, 857 N.E.2d 187, 195 (2006). "This

deferential standard of review is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Jones*, 215 Ill. 2d 261, 268, 830 N.E.2d 541, 548 (2005). Such findings are against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *People v. Beverly*, 364 Ill. App. 3d 361, 368, 845 N.E.2d 962, 969 (2006). Reviewing courts, however, remain free to assess the facts in concert with the issues to draw conclusions when determining appropriate relief. *Luedemann*, 222 Ill. 2d at 542, 857 N.E.2d at 195.

We first address the State's contention that the trial judge's factual findings were against the manifest weight of the evidence. According to the State, the trial court's adoption of Officer Dervisevic's testimony that defendant was "threatening to call" the victim was against the manifest weight of the evidence. The State's argument is premised upon the court's rejection of its claim that the transcript contained a typographical error. The State contends the evidence of the officers' "immediate reaction" to the second call make the trial court's finding "unreasonable and arbitrary to find that defendant merely threatened to 'call' the victim the second time."

On the record before us, we cannot conclude the trial court's factual conclusions were against the manifest weight of the evidence. Unquestionably, the trial court was in the best position to evaluate the evidence before it. *Jones*, 215 Ill. 2d at 268, 830 N.E.2d at 548. It is clear the trial judge paid careful attention to the evidence presented at the hearing and was confident in his recollections. Moreover, the judge's impressions are buttressed by the observations and professional assessment of the court reporter. It is not our place to substitute

our judgment for that of the trial judge on this factual matter. See *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 155, 839 N.E.2d 524, 531 (2005). Nevertheless, we do not perceive that the opposite conclusion is "clearly evident." *Beverly*, 364 Ill. App. 3d at 368, 845 N.E.2d at 969. Manifestly, our conclusion is the same as to the basic historical facts supporting the trial judge's suppression order.

Next, we turn to the trial court's legal conclusion in suppressing the evidence against defendant. Fundamentally, the fourth amendment to the United States Constitution (U.S. Const., amend. IV) and article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, §6) protect individuals from unreasonable searches and seizures. See *People v. Rosenberg*, 213 Ill. 2d 69, 77, 820 N.E.2d 440, 446 (2004). As our supreme court aptly observed in *Luedemann*, "The touchstone of the fourth amendment is reasonableness." *Luedemann*, 222 Ill. 2d at 566, 857 N.E.2d at 208.

Our fourth amendment jurisprudence instructs that not all encounters between citizens and police officers result in a seizure. *People v. White*, 221 Ill. 2d 1, 21, 849 N.E.2d 406, 418 (2006). Illinois courts utilize a three-tiered analytical framework to apply to law enforcement interactions with private citizens. They include, (1) arrests, requiring probable cause; (2) brief investigative detentions or "*Terry* stops" requiring a reasonable, articulable suspicion of criminal activity; and (3) encounters devoid of coercion or detention, not implicating the fourth amendment. *Luedemann*, 222 Ill. 2d at 544, 857 N.E.2d at 196.

In the case *sub judice*, the State aptly concedes that the third category of encounters has no application to the instant facts, given its acknowledgment:

"The officers conducted a valid *Terry* stop and frisk when they handcuffed

defendant and conducted a limited search for weapons because, given the facts

known to them at that time and the inferences that they were entitled to draw

based on their law enforcement training, defendant's behavior created a

reasonable suspicion that criminal activity was afoot and that defendant might be

armed and dangerous."

Likewise, in articulating his ruling, the trial judge rejected the interpretation of the events as a

field interview of defendant. We agree. The record before us demonstrates that the officers

approached defendant and immediately restrained him, without the exchange of any words or

other pleasantries. Consequently, we conclude this could not be characterized as a consensual

encounter as it involved a significant degree of coercion and detention. See *Luedemann*, 222 Ill.

2d at 544, 857 N.E.2d at 196.

On appeal, the State offers five reasons why the trial court was incorrect in concluding

defendant was arrested without probable cause upon being handcuffed. To this end, the State

posits that: (1) handcuffing during the course of a *Terry* stop does not elevate the encounter to an

arrest; (2) here the series of events demonstrated defendant threatened to kill the victim; (3) the

handcuffing was done for Dervisevic's safety and not because he "believed he could

automatically search anyone that he wants to talk to"; (4) when possessed of specific articulable

facts that would lead an officer to believe a citizen is armed or dangerous, an officer may conduct

a frisk before posing any questions; and (5) when Dervisevic responded to the second call

objective facts were present to give rise to a reasonable belief defendant was involved in criminal

activity, as well as armed and dangerous.

Although searches and seizures generally require a warrant issued upon probable cause, it is axiomatic that law enforcement officers may conduct warrantless investigatory stops where the officer "can point to specific, articulable facts that, when combined with rational inferences derived therefrom, create reasonable suspicion that the person seized has committed or is about to commit a crime." *Beverly*, 364 Ill. App. 3d at 368, 845 N.E.2d at 969, citing *Terry v. Ohio*, 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880 (1968); *People v. Lee*, 214 Ill. 2d 476, 487, 828 N.E.2d 237, 246 (2005). Moreover, section 107-14 of the Code of Criminal Procedure of 1963 (Code) codifies *Terry* and provides, "A peace officer *** may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense ***." 725 ILCS 5/107-14 (West 2008). In turn, section 108-1.01 of the Code, "Search During Temporary Questioning," provides:

> "When a peace officer has stopped a person for temporary questioning pursuant to Section 107-14 of this Code and reasonably suspects that he or another is in danger of attack, he may search the person for weapons. If the officer discovers a weapon, he may take it until the completion of the questioning, at which time he shall either return the weapon, if lawfully possessed, or arrest the person so questioned." 725 ILCS 5/108-1.01 (West 2008).

Principles underlying our analysis do not mandate that the facts forming the basis of reasonable suspicion need rise to the level of probable cause and do not require an officer to

actually witness a violation. *People v. Richardson*, 376 Ill. App. 3d 612, 625, 876 N.E.2d 303, 314 (2007). Nevertheless, a "*Terry* investigative detention cannot be justified, however, on the basis of 'unparticularized suspicion' or on a 'hunch.' " *People v. Gherna*, 203 Ill. 2d 165, 181, 784 N.E.2d 799, 808-09 (2003), quoting *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883. As the court in *Beverly* explained:

> "We objectively consider whether a stop was proper, looking at the facts available to the officer at the time of the seizure to determine whether his or her actions were appropriate. *Luedemann*, 357 Ill. App. 3d at 420. The situation encountered by the officer must be so far from the ordinary that any competent officer would be expected to act quickly." *Beverly*, 364 Ill. App. 3d at 369, 845 N.E.2d at 969.

Establishing whether an officer is justified in conducting a *Terry* stop is a fact-driven process and must be approached on a case-by-case basis. *People v. Hubbard*, 341 Ill. App. 3d 911, 917, 793 N.E.2d 703, 709 (2003).

In the case *sub judice*, the officers responded to a second call concerning defendant at the same location. The radio call essentially indicated that defendant had again presented himself at the victim's home, possibly trespassing, harassing or threatening her. Notably, this was in the wake of the officers escorting him off of the premises approximately 10 minutes earlier. When the officers returned to the area, they observed the defendant, once more, walking down the block. Based upon the facts objectively available to the officers at the time, it was reasonable for them to conduct a brief investigatory stop. See *Beverly*, 364 Ill. App. 3d at 369, 845 N.E.2d at 969.

Nonetheless, the question before us requires more than merely determining whether the stop was appropriate at its inception. We must consider whether the stop escalated, requiring an additional quantum of suspicion or cause to justify the officer's actions. According to Officer Dervisevic's testimony, the officers approached defendant and, with utterly no discussion or interaction, placed him in handcuffs, conducted a search of his person, and discovered a handgun secreted in his sock. Prior to that point, there was no indication defendant was armed. Moreover, the testimony at the hearing demonstrated that defendant was cooperative with responding officers on both occasions. In support of its contention that the officers' actions in handcuffing defendant did not transform the encounter into an arrest, the State cites numerous cases. Those cases are factually inapposite to the case at bar.

We do, of course, recognize that not all circumstances wherein handcuffing and detention occur necessarily convert a lawful *Terry* stop into an arrest. *People v. Walters*, 256 Ill. App. 3d 231, 237, 627 N.E.2d 1280, 1285 (1994); *People v. Waddell*, 190 Ill. App. 3d 914, 926, 546 N.E.2d 1068, 1075 (1989). Yet, courts have observed that the use of handcuffs in a particular detention is indicative of an arrest, rather than a *Terry* stop, because it heightens the degree of intrusion and is not, generally, part of a such a stop. *People v. Arnold*, 394 Ill. App. 3d 63, 70, 914 N.E.2d 1143, 1150 (2009). Importantly, concerns for officer safety and the safety of the public can, in certain limited circumstances, justify handcuffing during a brief investigatory stop. *Arnold*, 394 Ill. App. 3d at 70, 914 N.E.2d at 1150. Moreover, "the fact that handcuffing takes place before an officer has probable cause to arrest is not an automatic violation of the fourth amendment." *Arnold*, 394 Ill. App. 3d at 71, 914 N.E.2d at 1150.

In *Arnold*, our Second District examined factual scenarios where restraining a suspect with handcuffs would be appropriate, including three armed robbery suspects in a car shortly after the offense (*People v. Walters*, 256 Ill. App. 3d 231, 235, 627 N.E.2d 1280, 1284 (1994)) and narcotics cases where the suspect is in a vehicle (*People v. Nitz*, 371 Ill. App. 3d 747, 754, 863 N.E.2d 817, 824 (2007), citing *People v. Waddell*, 190 Ill. App. 3d 914, 927, 546 N.E.2d 1068, 1076 (1989)). *Arnold*, 394 Ill. App. 3d at 71, 914 N.E.2d at 1150.

We note that *Walters*, *Nitz*, and *Waddell* are among a litany of cases cited by the State in support of the argument that placing a suspect in restraints does not amount to an arrest *per se*. In *Walters*, the court found the officer's actions in detaining the suspects in an armed robbery were reasonable under those circumstances because one could reasonably conclude the suspects were armed and dangerous. *Walters*, 256 Ill. App. 3d at 238, 627 N.E.2d at 1286; *People v. Staten*, 143 Ill. App. 3d 1039, 1052-53, 493 N.E.2d 1157, 1164-65 (1986) (placing suspect in squad car viewed as a limited intrusion during investigation of, ultimately fatal, officer-involved shooting). In *Nitz*, the court determined that given the evidence, the issue of handcuffing was not relevant because the officer had probable cause to arrest prior to the time the defendant was detained based on the officer's detection of the odor of cannabis. *Nitz*, 371 Ill. App. 3d at 754, 863 N.E.2d at 824. Likewise, in *Waddell*, the court concluded there was "nothing unreasonable about police officers being apprehensive concerning the risks inherent in interdicting drug traffic" and that the absence of a weapon was not the same as an absence of danger. Consequently, it was reasonable to handcuff the defendant during the approximately 15 to 20 minutes it took to conduct a canine search of the vehicle, which uncovered cocaine in the trunk.

-14-

*Waddell*, 190 Ill. App. 3d at 927, 546 N.E.2d at 1076. In each of these cases, probable cause to arrest was developed during the course of the defendants' detentions.

The State avers that "this Court has held that suspicion of a crime of violence or a drug-trafficking offense is sufficient to justify the use of handcuffs during a *Terry* stop. [Citation.]" This is a telling and important observation in the context of the case presently before us. Nonetheless, this is no such case. Here, defendant was immediately restrained and searched. There was no temporary questioning pursuant to section 107-14. No attempt to investigate the situation was undertaken in any manner. The officers were armed only with a radio call directing them to return to a scene they recently departed. At best the facts they possessed arguably sufficed to support a *Terry* stop. See *Beverly*, 364 Ill. App. 3d at 369, 845 N.E.2d at 969. Instead, we concur with the trial judge that the officers did what can only be described as an arrest.

Another case cited by the State, *People v. Vena*, 122 Ill. App. 3d 154, 460 N.E.2d 886 (1984), is offered as presenting an analogous situation to the case at bar. However, the facts of *Vena* differ importantly. In *Vena* officers responded to calls concerning suspicious men in an area where several burglaries recently occurred. The incident took place on a snowy night, with six to eight inches of snow on the ground. The officers followed footprints in the snow from the residence where one of the calls originated, eventually observing the defendants. *Vena*, 122 Ill. App. 3d at 161, 460 N.E.2d at 891. The officers announced their office and ordered the defendants to halt. Instead, the defendants fled on foot. Defendant Vena physically resisted efforts to restrain him, resulting in an injury to one of the officers. *Vena*, 122 Ill. App. 3d at 157,

460 N.E.2d at 889. According to the testimony of one of the officers, the defendants were taken into custody because "they ran from police, failed to stop, and refused to identify themselves." *Vena*, 122 Ill. App. 3d at 158, 460 N.E.2d at 890. During a pat-down search of Vena, two large objects were felt in one of his back pockets, which turned out to be "a yellow plastic flashlight and a large folding knife." The men were then transported to the police station and 15 to 20 minutes later the officers received a call about an attempted burglary in the area where defendants were observed. Vena was searched again and more items were recovered from him, some of which were identified as proceeds from a recent burglary in an adjoining town patrolled by the same police department. *Vena*, 122 Ill. App. 3d at 159, 460 N.E.2d at 890.

Based on these facts, the court concluded the officers "had knowledge of sufficient specific and articulable facts to justify a stop of defendants in order to maintain the status quo while they investigated for criminal activity." *Vena*, 122 Ill. App. 3d at 161, 460 N.E.2d at 892. Additionally, the officers were justified, based on *Terry*, as well as sections 107-14 and 108-1.01 of the Code, to search for weapons, where the men attempted to flee and where Vena offered physical resistance. *Vena*, 122 Ill. App. 3d at 161, 460 N.E.2d at 892. Therefore the detention was reasonable in order to conduct further investigation. Furthermore, the circumstances of the detention and transportation of the defendants were not unreasonable, particularly where "[n]o effort was made to interrogate or identify defendants or impose any intrusive investigation upon them." *Vena*, 122 Ill. App. 3d at 162, 460 N.E.2d at 892. Additionally, taking the men to the station was not any more "intrusive *per se* than detaining them in the open field or in the squad car. In fact both the squad car and the stationhouse protected the defendants and police officers

from blizzard-like weather conditions." *Vena*, 122 Ill. App. 3d at 163, 460 N.E.2d at 893. The ultimate arrest of the defendants did not occur until shortly after – within 15 to 20 minutes – their arrival at the police station and was based upon probable cause and within an hour of the initial call. Therefore, the trial court's ruling suppressing the items recovered in the *Terry* pat-down and later search incident to the arrest at the station was in error. *Vena*, 122 Ill. App. 3d at 164-65, 460 N.E.2d at 894.

Absent the transportation component of *Vena*, the situation is clearly distinguishable from the case at bar. Here, the defendant did not attempt to flee or struggle. On the contrary, the unrebutted testimony indicated that he was fully cooperative at all points during the interactions with the officers, including the initial call when he was asked to leave the premises and when the officers approached him following the second call. The court in *Vena* emphasized the actions of the defendants in ignoring the officers' order, attempting to flee, and Vena's resistance to being detained, as justifying and supporting the reasonableness of the initial pat-down search. *Vena*, 122 Ill. App. 3d at 161, 460 N.E.2d at 892. No such circumstances are present in the case *sub judice*. Instead, the officers were solely responding to a call. There were no additional investigative developments to support taking defendant into custody.

Arguably, in the instant case the officers could have inferred, based on the radio call, that defendant had just committed an offense and, therefore, been justified in temporarily stopping him in accordance with section 107-14. 725 ILCS 5/107-14 (West 2008). However, it is the subsequent provision of section 107-14, permitting officers to "demand the name and address of the person and an explanation of his actions" (725 ILCS 5/107-14 (West 2008)), which we deem

problematic for the responding officers. The record demonstrates the officers did nothing of the sort. Yet, that is not the end of the analysis. Section 108-1.01 permits officers to search a subject stopped for temporary questioning, pursuant to section 107-14, for weapons where the officer "reasonably suspects that he or another is in danger of attack." 725 ILCS 5/108-1.01 (West 2008). We note that an officer need not have absolute certainty a suspect is armed in order to justify a search. *People v. Ware*, 264 Ill. App. 3d 650, 655, 636 N.E.2d 1007, 1010 (1994). Instead, "The issue is whether a reasonably prudent person in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Ware*, 264 Ill. App. 3d at 655, 636 N.E.2d at 1010, citing *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883.

In the case at bar, the record offers no support for a finding of any reason to so suspect. As noted, defendant was cooperative at all times during his encounters with police. The radio call was not sufficiently detailed to warrant a suspicion that defendant posed a risk of attack. Unlike the situation presented in *Ware*, the officers did not observe a bulge in defendant's clothing, he was not observed in an area known for gun arrests, and he was not leaving a "notorious location." *Ware*, 264 Ill. App. 3d at 656, 636 N.E.2d at 1010-11. Had the officers stopped defendant and conducted a further investigation of the call triggering their response, a basis to search defendant might have arisen based upon a search incident to arrest based on probable cause. Furthermore, attempting to justify the officers' actions based on their efforts to insure their own safety are understandable. However, they are unavailing when juxtaposed to the circumstances of this case, where there was no basis to suspect the presence of weapons or risk of attack. As additional support for the officers' actions, the State points out the recognition that

domestic violence situations are potentially dangerous, hazardous, and unpredictable for officers. This claim harkens back to our conclusion in *People v. Rivera*, "We find that the mere fact that an officer believes drug dealers carry weapons or narcotic arrests involve weapons is insufficient alone to support reasonable suspicion to justify a *Terry* frisk." *People v. Rivera*, 272 Ill. App. 3d 502, 509, 650 N.E.2d 1084, 1090 (1995). We are equally reluctant to believe the nature of domestic disturbances is sufficient to justify such an intrusion.

Consequently, the trial court's order granting defendant relief on his motion was not in error. Although there may well have been a reasonable suspicion to warrant a *Terry* stop, that is simply not what occurred. The trial court correctly concluded defendant's arrest was not lawful.

The State further argues the trial court's suppression of the bullets found in defendant's vehicle was erroneous. According to the State, that evidence was discovered by virtue of a valid inventory search, as a lawful search incident to a valid arrest, or, in the alternative, the bullets were subject to the inevitable discovery rule. The towing and inventory search occurred subsequent to defendant's arrest. According to Dervisevic, after advising defendant of his *Miranda* rights, he asked him whether he had a car. Defendant responded affirmatively and described where it was parked. Dervisevic then, in order to "make sure prisoner [*sic*] property is safe," returned to the 1300 block of Argyle and located the car, which was parked illegally in a designated handicapped parking spot. Dervisevic issued a citation, requested a tow truck, and conducted a search wherein he found ammunition matching the caliber of the handgun recovered from defendant. The State describes Dervisevic's conduct as falling within the rubric of the "community caretaking function" of the police.

-19-

1-09-0792

In *Wong Sun v. United States*, the Supreme Court determined that evidence obtained by virtue of an illegal arrest may trigger the application of the exclusionary rule, making such evidence inadmissible against a defendant. *Wong Sun v. United States*, 371 U.S. 471, 484-86, 9 L. Ed. 2d 441, 453-54, 83 S. Ct. 407, 415-17 (1963). Yet, a conclusion that a defendant was illegally detained is not the sole consideration in determining whether evidence obtained subsequent to the detention will be admissible. *People v. Johnson*, 237 Ill. 2d 81, 92, 927 N.E.2d 1179, 1186 (2010), citing *People v. Lovejoy*, 235 Ill. 2d 97, 130, 919 N.E.2d 843, 861 (2009). In *Lovejoy*, where the defendant sought the exclusion of certain statements, our supreme court explained:

> "The relevant inquiry is whether the statements bear a sufficiently close relationship to the underlying illegality. *New York v. Harris*, 495 U.S. 14, 19, 109 L. Ed. 2d 13, 21, 110 S. Ct. 1640, 1643 (1990). Generally, courts resolve this question by considering whether the evidence was obtained 'by means sufficiently distinguishable to be purged of the primary taint' of illegality. *Wong Sun v. United States*, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417 (1963). However, this attenuation analysis is only appropriate where the evidence sought to be suppressed was actually obtained as a result of some illegal government activity. *Harris*, 495 U.S. at 19, 109 L. Ed. 2d at 21, 110 S. Ct. at 1643; *People v. McCauley*, 163 Ill. 2d 414, 448 (1994) ('[w]hen police conduct results in a violation of constitutional rights, evidence obtained as a result of that violation, and only evidence so obtained, is to be suppressed'); *People v. Gervasi*, 89 Ill. 2d 522, 528 (1982) ('[t]he basic

-20-

assumption underlying the "fruit of the poisonous tree" doctrine is that the challenged evidence is *derived* from some violation of a statutory or constitutional right' (emphasis in original))." *Lovejoy*, 235 Ill. 2d at 130, 919 N.E.2d at 861.

Given the state of this record, we reject the claim that the series of events described is sufficient to remove the taint of illegality. Each event followed and flowed from the initial, unlawful arrest of defendant. We do not discern a break in the chain sufficient to attenuate the recovery of this evidence from the initial illegality of the arrest. Moreover, the State's characterization of Dervisevic's actions as manifesting a "community caretaking function" is similarly unavailing. A review of case law makes clear that the concept of "community caretaking" is most often invoked to describe encounters between police officers and citizens and not, necessarily, for the protection of property. See *Luedemann*, 222 Ill. 2d at 548, 857 N.E.2d at 198.

Unquestionably, a police officer, such as Officer Dervisevic, would be empowered and properly ought to issue citations to vehicles illegally parked, as well as towing them when warranted. However, our research did not disclose any cases where vehicles towed for parking violations were subject to inventory searches. Likewise, no cases were identified by the State or revealed by our research wherein a parking violation subject to towing provided probable cause to search. As noted, reasonableness is the fundamental consideration in fourth amendment analyses. See *Luedemann*, 222 Ill. 2d at 566, 857 N.E.2d at 208. Consequently, even if the parking violation, inventory search, and tow were separated from defendant's unlawful arrest, the search was unreasonable in fourth amendment terms as lacking sufficient probable cause.

The State additionally points to the inevitable discovery doctrine an exception making the ammunition found in the vehicle admissible against defendant. This exception permits evidence "to be admitted where the State can show that such evidence 'would inevitably have been discovered without reference to the police error or misconduct.' *Nix v. Williams*, 467 U.S. 431, 448, 81 L. Ed. 2d 377, 390, 104 S. Ct. 2501, 2511 (1984); [citation]." *People v. Sutherland*, 223 Ill. 2d 187, 228, 860 N.E.2d 178, 209 (2006). We cannot conclude this evidence would have been inevitably discovered based on the record before us. The " 'police error or misconduct' " is inextricably linked to the discovery of this evidence. As noted, we rejected the State's argument as to the inventory search based on the parking violation. Since the State's argument in favor of inevitable discovery is unmistakably linked to the matter of illegal parking, we find this argument similarly meritless.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

FITZGERALD SMITH and HOWSE, JJ., concur.